UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA

CASE NO. 3:07-CV-186-J-33JRK

DARRYL ALLMOND, PARALEGAL,

     Plaintiff,

vs.

BANK OF AMERICA, et al;
EDDIE CORASCO; JANET HUNTER;
CHEX SYSTEMS; PRIMARY
PAYMENTS, INC., KEN LEWIS,
CEO; JOHN AND JANE DOE,

     Defendants.

Deposition of DARRYL ALLMOND

Monday, May 19, 2008
9:35 a.m. - 1:25 p.m.

Esquire Deposition Services
200 W. Forsyth Street, Suite 450
Jacksonville, Florida 32202

Reported By:
Gina Oertli, RMR
Notary Public, State of Florida
Esquire Deposition Services, LLC
Jacksonville Office Job# 932513
Phone - 877.598.1044
        904.598.1044

APPEARANCES:

Plaintiff, Pro Se:
DARRYL ALLMOND, PARALEGAL

On behalf of the Defendants, Bank of America,
Eduardo Carrasco and Ken Lewis:
MARC T. PARRINO, Esquire
LIEBLER, GONZALEZ & PORTUONDO, P.A.
44 West Flagler Street
Miami, Florida 33130

On behalf of the Defendant, Early Warning Systems:
SETH P. TRAUB, Esquire
SHUMAKER, LOOP & KENDRICK, LLP
101 East Kennedy Blvd., Suite 2800
Tampa, Florida 33602

---
INDEX
---

| WITNESS: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| DARRYL ALLMOND | | | | |
| BY MR. PARRINO | 4 | | | |
| BY MR. TRAUB | | 95 | | |
| BY MR. PARRINO | | | 144 | |
| BY MR. TRAUB | | | | 157 |
| BY MR. PARRINO | | | 162 | |

| EXHIBITS | PAGE |
|---|---|
| Exhbt No. 1 | 19 |
| Exhbt No. 2 | 23 |
| Exhbt No. 3 | 31 |
| Exhbt No. 4 | 38 |
| Exhbt No. 5 | 42 |
| Exhbt No. 6 | 44 |
| Exhbt No. 7 | 54 |
| Exhbt No. 8 | 56 |
| Exhbt No. 9 | 57 |
| Exhbt No. 10 | 59 |
| Exhbt No. 11 | 62 |
| Exhbt No. 12 | 62 |
| Exhbt No. 13 | 65 |
| Exhbt No. 14 | 68 |
| Exhbt No. 15 | 70 |
| Exhbt No. 16 | 72 |
| Exhbt No. 17 | 73 |
| Exhbt No. 18 | 76 |
| Exhbt No. 19 | 81 |
| Exhbt No. 20 | 84 |
| Exhbt No. 21 | 86 |
| Exhbt No. 22 | 96 |
| Exhbt No. 23 | 98 |
| Exhbt Nos. 24 & 25 | 103 |

DARRYL ALLMOND,

having been produced and first duly sworn as a witness,

then testified as follows:

DIRECT EXAMINATION

BY MR. PARRINO:

Q Good morning, sir. My name is Mark Parrino, and

I represent Bank of America. Could you please state your

name for the record.

A My name is Darryl Allmond, paralegal.

Q Have you ever used any other name, sir?

A No, sir.

Q Do you have a middle name?

A No, sir.

Q Have you ever had your deposition taken before?

A Yes, I have.

Q How many times?

A Just maybe last year I had depositions with

Virginia Norton, general counsel's office, last year,

and I have been in other depositions in the state of

New Jersey.

Q Who is Virginia Norton?

A She's general counsel for the city of

Jacksonville.

Q Is that in a lawsuit you have filed against the

city of Jacksonville?

A Yes, it is.

Q What is the subject matter of that lawsuit?

A Civil rights — constitutional violations of my

civil rights, based upon excessive force.

Q And you also mentioned that there had been

several depositions in New Jersey.

A Yes, civil rights violations, due process,

fourth amendment, eighth amendment claims, fifth

amendment claims, maybe even first amendment claims.

Q At the present -- and were you a plaintiff in

all those lawsuits?

A No. I was pro se in all those lawsuits.

Q Okay. Let me clarify: Were you the one

bringing the lawsuit, or were they bringing the lawsuit

against you?

A I was bringing the lawsuit against them.

Q So you were a pro se plaintiff?

A Correct.

Q Okay. Now, I'm going to go over just again -- I

know you've had your deposition taken before, but I'm

going to go over just again a few of the ground rules.

First, for the ease of the court reporter, I

would like you to listen to all my questions before you

respond, because when we speak over each other, it

becomes hard to -- for her to transcribe things.

1　　　Second, try to speak slowly and deliberately so
2　that she can take down everything you say. I notice
3　you're kind of a fast talker, so it might be difficult
4　for her.
5　　　Third, your responses to my questions need to
6　be oral because she cannot take -- the court reporter is
7　unable to take down nods of the head. And, finally, if
8　I ask a question and you don't understand it, just let
9　me know so I can rephrase it for you.
10　　　Other than the lawsuits that we have discussed
11　here, are there any other lawsuits that you have brought
12　in which you were not deposed?
13　　A　Yes, there were lawsuits that I was not deposed,
14　but I don't recall the civil action numbers on them.
15　　Q　Are there any other lawsuits at this time that
16　you have filed in maybe state court or in federal court
17　that you have proceeding at this time?
18　　A　Yes.
19　　Q　Against whom are those lawsuits?
20　　A　I just filed two lawsuits against the state
21　prosecutor's office in Jacksonville here, Laurie Propel,
22　and Mr. Mantise (phonetic), a prosecutor supervisor, for
23　violation of constitutional protection, grading
24　material. That was filed in the state court. It was
25　just moved to United States District Court.

1　　　And then the other case I have is the case here
2　with Bank of America. I did give notice of a pending
3　suit to other -- to an employee/clerk against me with
4　respect to defamation, but I haven't actually filed that
5　particular lawsuit. I just gave them notice on that
6　one.
7　　Q　Did you have intent to file that lawsuit?
8　　A　Yes, I did serve them with a notice of intent.
9　I served an insurance company with a notice of intent
10　and a car dealership, and I brought a lawsuit against
11　them. Correction: A lawsuit against the car agency and
12　insurance company.
13　　Q　What is the name of the car agency?
14　　A　I think I have that. I think it's
15　Aztec (phonetic) Insurance and --
16　　Q　It's okay. If you remember. If you don't
17　remember, that's fine.
18　　A　Oh. Just Right, that's what the name was.
19　　Q　Just Right?
20　　A　Just Right, the auto insurance, yes.
21　　Q　Are you going to be pro se in that litigation as
22　well?
23　　A　Yes, I will be pro se in those litigations.
24　　Q　Where were you born, sir?
25　　A　Somerville, New Jersey.

1　　Q　And in what year?
2　　A　1955.
3　　Q　When did you move to the state of Florida?
4　　A　August 2004.
5　　Q　And where were you residing before that?
6　　A　I lived -- just prior to that, I lived in
7　Alexandria, Virginia.
8　　Q　How long did you live in the Commonwealth of
9　Virginia?
10　　A　Since the year December 2002, about, until I
11　came to Florida in August.
12　　Q　Where did you live before moving to Virginia?
13　　A　New Jersey.
14　　Q　Where in New Jersey?
15　　A　Elizabeth, New Jersey; Plainfield, New Jersey --
16　actually, Plainfield, New Jersey, was my last address in
17　New Jersey before I moved to Virginia.
18　　Q　And that was from the time of your birth until
19　you moved to Virginia?
20　　A　No. I lived in several other cities in the
21　state of New Jersey.
22　　Q　Right. But you resided in New Jersey from the
23　time of your birth till --
24　　A　Yes, yes, basically.
25　　Q　Where do you -- what is your current address?

1　　A　3830 University Boulevard South, Apartment 31,
2　Jacksonville, Florida, 32216.
3　　Q　Now, during the course of this litigation, you
4　have had several addresses that you've used; is that
5　correct?
6　　A　That's correct.
7　　Q　You have also lived, I believe, on Kings -- is
8　it Kings Avenue?
9　　A　Old Kings Road.
10　　Q　Old Kings Road?
11　　A　Yes.
12　　Q　Who did you live with there?
13　　A　My wife.
14　　Q　What is your wife's name, sir?
15　　A　Her name is Jane Charles.
16　　Q　How long have the two of you been married?
17　　A　Since about 2004.
18　　Q　Do you still live with Mrs. Charles?
19　　A　Yes, I do.
20　　Q　She lives with you at University Boulevard at
21　this time?
22　　A　Yes, I'm with her.
23　　Q　Now, you've also -- during the course of this
24　litigation, you've also had an address that would be the
25　Duval County Detention Center?

1    A  Duval, yes. The Duval County jail, yes. I was
2  there for, what, 27 days -- about 27 days.
3    Q  And why were you -- why were you there?
4    A  It was an alleged battery --
5    Q  Against --
6    A  -- domestic.
7    Q  Against whom?
8    A  Against Jane Charles. But that case is still
9  open. The case has been reopened, so it's only alleged.
10  Then that's the reason why the state prosecutor didn't
11  prosecute because he would have Brady material evidence
12  that would have negated my guilt.
13    Q  Does anybody else live with you at the
14  University Boulevard address?
15    A  A 16-year-old and a 21-year-old.
16    Q  Are those your children?
17    A  They're my step -- step-kids.
18    Q  They're Jane Charles' children?
19    A  Correct.
20    Q  From a previous marriage or previous
21  relationship?
22    A  A previous relationship.
23        THE WITNESS: I'm objecting to any information
24  regarding Jane Charles. Spousal privilege.
25        MR. PARRINO: I don't think there's going to be

1  any other questions about that. I'm just trying to
2  figure out who lives with you. That's all.
3  BY MR. PARRINO:
4    Q  Are you currently employed, sir?
5    A  No, sir.
6    Q  How long have you been unemployed?
7    A  Well, I started my SSI about -- when did I get
8  into it? Since about 2000 -- around 2001, 2002,
9  somewhere around there.
10    Q  So that would have been before you were living
11  in the state of Florida?
12    A  Yes. And then I worked mainly, like, at day
13  labor, one or two days, because this building only
14  allows you to make $80, so I could only work for this
15  period of time then because of my chronic injuries, pain
16  that I suffered from other injuries.
17    Q  Before going on disability, where were you
18  employed?
19    A  I worked at -- the name of the company was Home
20  Place. It was a department store where I fell off a
21  ladder. That was in Virginia. They're no longer in
22  business.
23    Q  Is that why you ceased working there, because
24  you fell off the ladder?
25    A  Well, the company moved.

1    Q  Why are you on disability, sir?
2    A  I have -- I have prior surgeries in my C-spine
3  that control my fingers, arms, shoulder, and neck, and
4  it's chronic in nature.
5    Q  Now, I notice you said earlier your name is
6  Darryl Allmond, paralegal.
7    A  Yes.
8    Q  Have you ever been employed as a paralegal?
9    A  No, I have not, but I graduated from paralegal
10  school, Ashworth University, Norcross, Georgia.
11    Q  Is that Ashworth University?
12    A  Yeah, Ashworth University.
13    Q  You were living in Norcross, Georgia, or that
14  was through the mail?
15    A  No. That was through the mail, correspondence.
16  I graduated on May the 5th, last year.
17    Q  So May 5th, 2007?
18    A  No. I'm sorry. May 5th, 2006, I think. 2006,
19  2007, one of those, either/or.
20    Q  Have you ever sought employment as a paralegal?
21    A  Well, actually -- actually, no, because I've
22  been doing my own cases, and I'm trying to get the
23  experience in doing litigation with attorneys, or
24  opposition, as -- with the opposition being attorneys,
25  for my experience, so later, when I do decide to, or try

1  to get a job as a paralegal, if I would be able to, then
2  I probably would.
3    Q  When you say that you're getting experience, is
4  that one of the reasons you filed these lawsuits?
5    A  Actually, I file lawsuits when my rights are
6  violated, and when the defendant violates the law, then
7  I have a right to redress.
8    Q  Is there a reason why you don't try to retain an
9  attorney for these lawsuits?
10    A  There's not no special reason, you know, since,
11  in my past, I have -- I went and talked with a lot of
12  lawyers and they would give me compliments and saying
13  that you're kind of good at this, you've been doing a
14  lot of studying, and a lot of them did encourage me to
15  go for a bar exam, but I said, no, I don't want to take
16  the bar exam, that I'm not ready for the bar exam yet.
17    Q  Have you sought admission to lawsuit?
18    A  No, I have not.
19    Q  Are you a high school graduate, sir?
20    A  I have a GED.
21    Q  Where did -- did you attend high school at
22  all --
23    A  Yes.
24    Q  -- before getting your GED? What high school
25  did you attend?

1    A   Well, the last high school I was in was Thomas
2   Jefferson High School -- that was in Elizabeth,
3   New Jersey -- and I think I stopped going in 1972 or
4   1973, so I only completed the tenth grade, and later I
5   got my GED.
6    Q   Have you attended any college and not just --
7   apart from paralegal school at Ashworth?
8    A   Yes. I attended, but I did not graduate, from
9   Burlington County College. That was in New Jersey.
10    Q   Is that a community college, or a four-year
11   college?
12    A   That's a community college. After that, I went
13   to business school, Sawyer School of Business. I
14   graduated from that.
15    Q   Where is the Sawyer School of Business?
16    A   It was in Plainfield, New Jersey.
17    Q   Did you physically attend that school, or is
18   that another correspondence school?
19    A   No. I physically attended.
20    Q   Do you presently maintain a bank account?
21    A   No, I don't. No banks -- all banks thus far has
22   refused to do business with me, pretty much, because of
23   the information that Bank of America circulated to
24   Primary Payment with the information that was false.
25   And other banks have said, because of this statement

1   that I abused an ATM machine, per Bank of America, and
2   that Bank of America gave this information, they're not
3   doing business with me. So I can't open up any
4   accounts -- for the last three years or more I was
5   unable to open an account.
6    Q   Do you presently have any credit cards?
7    A   No, I don't have any credit cards.
8    Q   Have you ever had any credit cards?
9    A   I had one credit card also, again, with Bank of
10   America, but when -- when they filed the false
11   information against me -- and I did have a small deposit
12   there, but I was still owing them on credit -- Bank of
13   America unlawfully seized that deposit money that was
14   there, from the credit agency, and used it towards my
15   checking account. And, in fact, I was not linked and
16   they wasn't authorized to take that $250, which it
17   should have stayed with the credit card agency.
18    Q   Now, was your credit card a separate card from
19   your debit card?
20    A   Yes, it was separate.
21    Q   So you had two cards?
22    A   I had two cards.
23    Q   Now, did you ever have a -- where was the last
24   place that you ever banked?
25    A   Had an account?

1    Q   Yes, the last place you ever had an account.
2    A   Bank of America was the last place.
3    Q   Do you know when you opened that account?
4    A   Sometime in -- I don't know whether it was in --
5   either early 2005 or in 2004, between that time, after
6   August 2004.
7    Q   So that would be late 2004 or early 2005?
8    A   That would be the -- it's around late 2004,
9   because I didn't even come to Florida until August of
10   2004. And these violations didn't happen until around
11   February 2005.
12    Q   Where did you bank when you lived in the
13   Commonwealth of Virginia?
14    A   In the Commonwealth of Virginia, I didn't have
15   an account, I don't believe. I didn't have an account
16   there. I don't think so. I can't recall for sure, but
17   I don't remember having an account. I don't remember
18   having a bank account for a very, very long period of
19   time.
20    Q   Where did you bank in New Jersey?
21    A   I don't recall. I don't recall. I know when I
22   was younger, I had an account, coming up from
23   kindergarten to first, second, third grade, but it could
24   have been late -- later than that when I got a little
25   bit older, but I don't recall the bank.

1    Q   How long did you maintain your bank account with
2   Bank of America?
3    A   I'm pretty sure it was less than a year.
4    Q   Is that account currently closed?
5    A   Yes. Bank of America closed all the accounts at
6   that period of time.
7    Q   Did you request that the account be closed?
8    A   No, I did not request the account to be closed.
9   They -- they closed it on their own, based upon those
10   unauthorized transactions, I believe.
11    Q   Now, you keep saying those unauthorized
12   transactions. Can you tell me what those unauthorized
13   transactions are?
14    A   They stated that I put bank envelopes into an
15   ATM machine. That, I never, ever did. At the time I
16   was in Duval County jail when that first unlawful
17   transaction took place, which was, I believe -- they
18   informed me about -- it was about 2 a.m. in the morning,
19   on the 19th; however, at 2 a.m. in the morning I was in
20   the Duval County Jail, and I was released on the 19th,
21   about 2 p.m.
22        I talked with Eddie Corasco about it. I
23   informed him that when the property room at the jail
24   returned my property, I noticed that my card was, in
25   fact, missing. I talked with Eddie Corasco about

1  issuing me a new card and also changing the card number.
2  At that time he said we would issue another card in 10
3  days. Indeed, he did issue another card, but it
4  appeared that the same number was on it. And I also
5  indicated to him that maybe they should close the ATM so
6  no other unauthorized transactions can take place.
7      Obviously, other transactions kept going on --
8  was ongoing. I have went across the street to the Bank
9  of America, 3535 University Boulevard. I informed
10  them -- I cooperated with them 110 percent. I had a
11  police report also regarding -- I had the guy's first
12  name, his cell phone number. I provided that to Bank of
13  America.
14  Q  Mr. Allmond, hold on. This is a lot of
15  information. I'd like to go through this slowly.
16  A  Yes. I'd like to put it on the record, also.
17      And in addition thereto, I talked with one of
18  the managers with Bank of America about the video
19  surveillance pictures, video surveillance cameras, which
20  is a silent witness, basically, to preserve those
21  pictures so I can help them ID the perpetrator.
22  Q  All right. We're going to go through that again
23  slower, because there's a lot of questions I have about
24  each of that, and that's why I was trying to stop you,
25  because I think we could have done it in a clearer way,

1  going slower.
2      But first I'd like to start with the fact
3  that -- about your imprisonment in the Duval County jail
4  on that date, and I'd just like to talk a little bit
5  about that.
6      And if you'll bear with me a little bit, I'm
7  going to find the report, so I can mark that as an
8  exhibit. I'm going to -- this is in the packet I also
9  gave you, if you want to look it up. We're just -- I'll
10  just show this to everybody.
11      MR. PARRINO: I'm going to have this marked as
12  Exhibit 1, please.
13      (Whereupon the above document was marked for
14  identification as Exhibit 1 and is attached hereto.)
15      MR. PARRINO: It's got a date on the --
16      MR. TRAUB: Top right, fax date?
17      MR. PARRINO: Yes.
18  BY MR. PARRINO:
19  Q  It's near the back of the packet. That should
20  be it.
21  A  Okay. Sunday -- okay. That's it, Sunday at
22  1:30.
23  Q  Okay. Now, on this document, your home address
24  is listed as 3770 Toledo Road --
25  A  Yes.

1  Q  -- Apartment 24.
2  A  Apartment 24, yes.
3  Q  How long did you live at that address?
4  A  That's -- Toledo Road, that was the first
5  apartment we lived at when we came here to Jacksonville
6  in 2004. I think we stayed here maybe -- maybe about a
7  year, I think.
8  Q  And when you say "we," that's your wife and the
9  two children?
10  A  Yes.
11  Q  And the two -- the two children?
12  A  Yes.
13  Q  Okay. By the way, just to go back to your
14  current residence, are you renting your current
15  residence?
16  A  Yes, just renting.
17  Q  Now, the time of arrest on this document is
18  listed as 1928 on Sunday -- that's the time of the
19  incident. That's the time of the incident. Excuse me.
20  The time of the --
21  A  Arrest.
22  Q  -- arrest would be 2032 on 2-18, so that would
23  be around 9 --
24  A  2-18, 1927, yes.
25  Q  So you were arrested in the evening of the 18th

1  then?
2  A  Yes.
3  Q  The time of the incident is a Sunday,
4  January 30th, 2005, at 1928. Do you recall what you were
5  arrested for?
6  A  I think it was a check -- I think it was an
7  overdraft check, a worthless check, in other words.
8  That's what they called it, a worthless check.
9  Q  And do you know to whom that check was made?
10  A  I think that worthless check was made out to me,
11  I think it was. Yes, it was made out to me. If it
12  wasn't made out to me, it had to be made out to either
13  the Publix store, or if it wasn't Publix store, it must
14  have been Winn-Dixie.
15  Q  How long did you spend in the detention center?
16  A  I was released the next day, on the 19th of
17  February, around 2 p.m. And if I ain't mistaken, I
18  think I mailed that off to your office, a copy of that
19  time of release.
20  Q  Now, you had stated that there were unauthorized
21  transactions on the 18th; is that correct?
22  A  I believe there was. I'm not sure.
23  Q  Well, you had stated that you were notified by
24  the bank at 2 a.m. of unauthorized transactions; is that
25  what you state?

1   A   No. My statement is that when I was released
2   from jail, Eddie Corasco, who was working at the Publix
3   store, the Bank of America mini -- the mini area where
4   Bank of America had a little office there, and I could
5   talk with him there. It was around 4 p.m., around that
6   time. By the time I got off the bus, where the bus
7   takes me right on University, and I had went over to
8   Publix and at the time their manager was, in fact,
9   working there and that's when I reported it.
10  Q   Okay. And you reported a stolen card?
11  A   Yes, I reported it, yes.
12  Q   Did you report any unauthorized transactions to
13  Eddie Corasco at that time, at the time?
14  A   Yes, I did. I told him that the card was
15  stolen. I didn't have it. I didn't have possession of
16  it.
17  Q   Did you tell him that somebody had been using
18  the card?
19  A   Well, I told him -- actually, what I told him
20  was that it was lost or stolen, because I didn't have it
21  with me when I left the jail.
22  Q   Okay.
23  A   And then he said we will issue me another card.
24  So my position was that if the card was lost or stolen,
25  then I would want a different card with a different

1   number on it.
2   Q   Now, on --
3       MR. PARRINO: We're going to go ahead and mark
4   the bank's statement for the period from February 8th,
5   2005, through March 11th, 2005, as an exhibit, and I'd
6   like to go over some of these transactions on there.
7       THE WITNESS: Sure.
8       MR. PARRINO: It's going to be a composite
9   exhibit.
10      (Whereupon the above document was marked for
11  identification as Exhibit 2 and is attached hereto.)
12  BY MR. PARRINO:
13  Q   I'd like to --
14      MR. PARRINO: Let me know when you've got
15  everything set up.
16      MR. TRAUB: I've got everything set up.
17  BY MR. PARRINO:
18  Q   Okay. I'd like to start with the second
19  transaction which is dated February 18th. It's a $700
20  deposit at the University Point. It's an ATM?
21  A   Yes.
22  Q   Did you make that deposit?
23  A   Yes. I was with this girl that I met, and she
24  had a friend that had a $700 check. He said he had just
25  got off work and she asked me if I would deposit it in

1   my account, and I agreed to deposit that check into my
2   checking account.
3       And, now, I didn't realize that this guy is the
4   one who probably stole the card from me because he was
5   standing behind my back when I was inserting my number.
6   So I did make the deposit for him. After I made the
7   deposit, I think $140, I think, was taken out at that
8   time.
9   Q   By you? You took out $140?
10  A   Yes, off of his check.
11  Q   Okay.
12  A   Okay. And then from there, we left. I told him
13  when the bank opens, I'll be able to give you this other
14  money back from your check, so he says okay. So that
15  wasn't a problem.
16      So when I went into the store, I appeared
17  there -- when I went into the store, I had my little
18  jacket on. And I went into the store and I had the card
19  in my jacket pocket, and it appears that it must have
20  been taken at that time, I believe.
21  Q   Do you know the name of this person?
22  A   I don't have it with me because between --
23  because of all the moving, I don't know if I can find it
24  or not, but I did turn over the name and the phone
25  number to one of the employees, managers, at Bank of

1   America. She was about five-foot-two, about -- she was
2   in her fifties, blonde hair, short blonde hair, maybe a
3   little gray may have been in it. She wore glasses. And
4   I think her responsibility was to -- was to open the ATM
5   machines and, I guess, remove the envelopes or the
6   deposits made, because I talked with her and that's when
7   I informed her to research the video surveillance tapes
8   because I could probably, more than likely, identify the
9   perpetrator, because he was standing behind me at that
10  particular time.
11  Q   Do you recall -- now, you were with a female
12  friend and this person when you went?
13  A   Yes, a female friend. She moved -- her name was
14  Neesie. I don't know her last name, because I was just
15  really, you know, not that familiar with a lot of people
16  in Florida.
17  Q   Where did you -- do you know where she moved to?
18  A   All I know is Orange Park somewhere.
19  Q   Do you still talk to her?
20  A   No. I haven't seen her for years now. A couple
21  of years I haven't seen her.
22  Q   And you met this -- this other man, you met him
23  through her?
24  A   Yes. That was her friend.
25  Q   You never knew him before?

1    A   No, I did not.

2    Q   Was there a reason why you agreed to deposit

3   this check into your account?

4    A   He said that -- basically, he said he just got

5   off work and he didn't have any of his IDs with him.

6   And I guess he wanted some money in his pocket, so I

7   tried to be a nice guy and tried to help.

8    Q   Now, do you know when the unauthorized

9   transactions on your card began?

10    A   I would think around -- around the 19th, I would

11   think, of February. Also, let me add that the Bank of

12   America manager, Eddie, told me that -- I asked him

13   about the check. He said he would send -- they couldn't

14   deposit the check on my account because he wasn't on my

15   account, so they would send the check back to me. They

16   never did. So I don't even know what ever happened to

17   that $700. I've never seen that check again.

18    Q   Now, I'd like to look at the bank statement

19   again. Did you make some purchases at Albertson's? I

20   see a purchase. I see Albertson's on here and I see Hess

21   Express. Did you make those purchases on the 18th?

22    A   On the 18th? Which ones are that?

23    Q   That would be a $40 purchase -- no, I'm sorry.

24   That would be $21.48 at Albertson's.

25    A   Albertson's?

1    Q   And a $12.31 purchase at the Hess Express.

2    A   Hess Express.

3    Q   That would be these two transactions right here,

4   sir.

5    A   These two? Were they gas purchases, because if

6   they were gas purchases, no.

7    Q   I can't tell you what those purchases are. I

8   wouldn't be able to tell you that --

9    A   I don't recall.

10    Q   But you did state that you went into the -- into

11   the store after depositing the check?

12    A   Right, right. But I don't know if that was the

13   Hess or not.

14    Q   Did you make a purchase after going into that

15   store?

16    A   I think I did. If I went -- yes, if it was a

17   store, yes, because what I had -- I didn't have the ATM

18   bank card, the big -- the one that you use for the

19   machine.

20    Okay. After we went and deposited the check

21   and I got arrested, I guess, later the next day or

22   something, or later that day, or whatever, that I got

23   arrested, when I was released, all I had was the small

24   card, the one that you put on your key chain. But the

25   ATM card itself, after the 18th, I never had possession

1   of that card again. And the little one that you use on

2   your key chain cannot be used on the ATM machine.

3    Q   Now, I'd like to direct your attention to a

4   series of transactions that had taken place on the 22nd,

5   and these are all deposits made into ATM machines, and we

6   see $1,000, $1,000, $640, $500, $500, $500, $500. Did

7   you make those deposits?

8    A   No, I did not, not one of them.

9    Q   Who made those deposits?

10    A   I don't know. It wasn't me. I didn't have the

11   card.

12    Q   Were you out of prison at that time?

13    A   Yes, I was out of prison at that time.

14    Q   Do you know how this -- who do you suspect made

15   those -- do you have a suspect as to who made those

16   transactions?

17    A   I think the suspect who I had in mind was the

18   guy that I deposited that check for, and this is the

19   information that I gave to the police, pretty much, and

20   in the suit, I told Bank of America. And that's why I

21   say if they would have reserved the video surveillance,

22   then I can identify that guy.

23    Q   But you still wouldn't have remembered his name,

24   or you would have?

25    A   No, I'm not sure of his name at all.

1    Q   Do you know how this person got your PIN?

2    A   My PIN was on my card, but I had it in code, so

3   it was hard for somebody to figure it out, but -- but I

4   was informing the bank that he was standing right over

5   my shoulder. And by us looking at the video

6   surveillance tapes, we could see exactly how close he

7   was and, in fact, he was, in fact, reading my number, as

8   I was putting it, over my shoulder. And that's why

9   those tapes are so important.

10    Q   Did you ever give this person your ATM code?

11    A   No.

12    Q   Now, when you were released from prison, was

13   that because bail was paid, or was that --

14    A   I was released by the court.

15    Q   Without any bail needing to be paid or posted?

16    A   She gave me time served, and just telling me to

17   pay the money back, and I did.

18    Q   Did you stay at a -- turning to the next page of

19   the account statement, did you stay at a Homewood Suites

20   in Jacksonville on February 22nd?

21    A   No, I did not.

22    Q   And did you make any of the withdrawals that are

23   shown on your account on February 22nd?

24    A   No, I did not.

25    Q   With regards to transactions on the 23rd --

1 they're also at the bottom of this page -- did you make
2 these deposits -- never mind. These are corrections.
3 Skip that.
4       Go to the next page, please. Did you stay at a
5 Homewood Suites in Jacksonville on February 23rd?
6     A No, I did not.
7     Q Did you stay at Motel 6 in Orlando on
8 February 23?
9     A No, I did not.
10     Q On the 24th, did you stay at a Homewood Suites
11 in Orlando?
12     A No, I did not.
13     Q Do you recall what time of day you went to the
14 ATM to deposit that $700 check?
15     A Excuse me?
16     Q The time of day that you went to the ATM to
17 deposit that --
18     A No, I don't recall.
19     Q You don't recall?
20     A No, I don't recall.
21     Q Can you tell me what you had with you at the
22 time you were put into jail?
23     A Can you explain?
24     Q Possessions. What possessions did you have on
25 you at the time that you were incarcerated?

1     A Well, I had my clothes on. I had my wallet. I
2 don't know what else. I don't recall.
3     Q Well --
4     A But I think I submitted you a copy of the
5 property receipt.
6     Q I'm looking for that, and we can -- we'll go
7 over that in a second, as soon as I'm able to locate that
8 document in here. Here it is. It's the very last
9 document in the packet.
10     MR. PARRINO: Go ahead and mark that as
11 Exhibit 3.
12     (Whereupon the above document was marked for
13 identification as Exhibit 3 and is attached hereto.)
14 BY MR. PARRINO:
15     Q Now, we're looking at the property record
16 receipt from the Department of Corrections. There's a
17 big, black number that says 2968 across. Do you know who
18 put that there?
19     A The jail employees.
20     Q Do you know why that's put there?
21     A No, I don't know why. I don't know the
22 operations there, why they would put a black mark number
23 here in this black marker.
24     Q There where it says credit card --
25     A Right.

1     Q -- it says Visa. What Visa card was that?
2     A That was my Visa credit card that I had from
3 Bank of America. Some could have been -- I remember
4 them giving me one with a picture on it, and they gave
5 me another credit card. And when you first open it, the
6 account, they give you a card. And the other two could
7 have been old.
8     Q So you had four cards on the account?
9     A Yes. Basically, I had four, yeah.
10     Q And you contend not a single one of those cards
11 were your ATM card?
12     A No, none of them were my ATM card.
13     Q Did you also have your driver's license with
14 you; is that correct?
15     A Yes.
16     Q You had 20 pairs of keys, 20 keys?
17     A On a key chain? It wasn't 20 keys, but there
18 was some keys on there.
19     Q You had your wallet with you?
20     A Yes.
21     Q Do you know what was in your wallet?
22     A Yes, papers and -- papers and stuff, my
23 identification -- my papers, identification, my credit
24 card, my voting registration, just miscellaneous stuff.
25     Q And the remaining items on here are your

1 clothes?
2     A Yeah. I had my tan boots or whatever. Yeah,
3 that's about it.
4     Q And you had a lighter on you?
5     A Yes, socks, lighter, belt, footwear, pants,
6 socks, underwear.
7     Q Does this document anywhere show the time that
8 you were released on it?
9     A Not this document, but I did send the document
10 of the time of my release. I think that may have been
11 the last document that I sent to your office.
12     Q Now, as soon as -- trying to follow along the
13 story you're telling me, one of the first things you did
14 when you got out of jail, you went to Bank of America to
15 report the theft of your card?
16     A Correct.
17     Q Which Bank of America did you go to?
18     A Well, actually, I went to Publix who has a Bank
19 of America center there in Publix, on University
20 Boulevard, right across the street from Bank of America
21 branch office, and that's where -- I think that didn't
22 close till, like, 6 o'clock, when they close the Publix
23 store, I think.
24     Q Do you know what -- right around 6 o'clock, you
25 think, is that the time you got there?

1    A No. I think I got there around 4:00.

2    Q Okay. Who did you report the theft of your card

3 to?

4    A To the manager, Eddie Corasco.

5    Q Corasco? Is his name Eddie Corasco?

6    A Yes.

7    Q Did you tell Mr. Corasco who stole your card?

8    A I told him that my card was stolen -- lost or

9 stolen, I told him. I don't recall if I told him

10 about -- about the guy or not, but I did later report it

11 to the police. And then I went over to the branch

12 itself and talked with the manager there, because it's

13 only, like, right across the street from Publix.

14    Q Did you tell the police the name of the person

15 who stole your card?

16    A At the time -- I don't think I had his name in

17 my possession at that particular time. But as I was

18 going through my papers, I think that's when I found his

19 name and all, and the phone number, and then I went back

20 to the substation on Powers Avenue and I reported that

21 information. And they said that they would send a

22 detective out and to provide the detective with that

23 information, and I says fine. And so I said, I'll also

24 give a copy of it to the bank, and I did give a copy of

25 it to the Bank of America.

1    Q How did you get this person's name?

2    A It was -- I think I had it -- it was mixed in

3 some papers of mine. And I give him his name and cell

4 phone number on a piece of paper, and I located it and

5 he immediately took action on it.

6    Q Now, you have named -- as a matter of fact, you

7 have named Eddie Corasco as a party to this lawsuit; is

8 that correct?

9    A Correct.

10    Q And let's talk about this lawsuit. The basis of

11 this lawsuit is basically that the parties you have named

12 have violated the Fair Credit Reporting Act; is that

13 correct?

14    A They violated the fair reporting -- they

15 violated -- I believe they violated the fair reporting

16 credit act. I believe they were grossly negligent, that

17 they knew about that my card was lost. I feel like they

18 could take any reasonable steps to try to -- to try to

19 correct the wrongs and/or maybe issue another card with

20 another number on it.

21      It took them six days to even close the

22 account, so I believe that they failed to follow

23 reasonable procedures and was contrary to the law. And

24 maybe if they would have followed the right procedures,

25 we wouldn't be here now.

1    Q Now, but you're aware now that the court has --

2 for whatever other wrongs you believe may have happened,

3 the court has narrowed the scope of your lawsuit to the

4 Fair Credit Reporting Act as to all these parties; that's

5 correct?

6    A Yes.

7    Q Okay. Now, do you believe that Eddie Corasco

8 personally ever reported any information about you to

9 Early Warning Systems?

10    A I don't know. All I know is that Bank of

11 America -- I talked with Mr. Overby or somebody from

12 Primary Payments about this, about the slanderous

13 information that was circulated about me, and I asked

14 him if he could remove that information. He says he

15 will contact Bank of America, and I assume they did

16 contact Bank of America.

17      And when I talked with him again on the phone,

18 he says, no, Bank of America is not going to take the

19 information. So I said that this appears to be an

20 incomplete investigation because if they conduct a

21 proper investigation, it would be evident that I

22 couldn't have did what they said because I wasn't there.

23 I didn't have the card.

24    Q And we'll go through the investigation a little

25 bit later. We have all those letters. I'm just trying

1 to understand why you have continued to name Eddie

2 Corasco as a party to this lawsuit when you don't know

3 whether or not -- or we have -- why is Eddie Corasco

4 still a party to this lawsuit, I guess is my question?

5    A Because he knew or should have known that if he

6 wouldn't act properly and according to their procedures

7 and policies, that my rights would be violated. We had

8 an agreement and he breached that agreement in addition

9 thereto. He should have closed the account -- or

10 stopped any transaction going to the ATM machine. He's

11 the supervisor. He could have took appropriate action.

12 He didn't do -- it appears that he just ignored it.

13    Q And that appropriate action would have been

14 taken as an employee of Bank of America, correct?

15    A Either/or. I'm not sure. But, I mean, as an

16 employee and just as a supervisor.

17    Q As a supervisor for Bank of America?

18    A Yes. He's a supervisor for Bank of America.

19    Q Okay. Now, you requested a new ATM card from

20 Bank of America; is that correct?

21    A Yes, I wanted a different card, yes, with a

22 different number.

23    Q Were you ever provided with that card?

24    A They did send the card to me, but I wasn't able

25 to use it by the time that I received it, because they

1  .give you 10 days. They had already closed all the
2  accounts, so the card was no good.
3  Q So the card was never activated then?
4  A No.
5  Q Now, I'd like to go over the police report from
6  when you called the police to your residence; okay? And
7  that's the next document we're going to review here.
8  It's in the middle of your packet, I believe.
9  MR. PARRINO: We'll go ahead and mark that as
10  the next exhibit, please.
11  (Whereupon the above document was marked for
12  identification as Exhibit 4 and is attached hereto.)
13  BY MR. PARRINO:
14  Q Now, this report was made on February 24th,
15  2005; is that correct?
16  A Correct.
17  Q And at that time you were still living at the
18  Toledo Road address; is that correct?
19  A That's correct.
20  Q Now, do you recall the name of the officer who
21  took this report down?
22  A Officer Price.
23  Q Officer Price. Okay. M.W. Price?
24  A Right, correct.
25  Q Now, let's look at the section that reads

1  additional information. It says, "Upon arrival I spoke
2  with the victim. The victim stated that on
3  February 18th, 2005, he was arrested. On February 19th,
4  2005, the victim was released from jail. When the victim
5  got released, he advised he could not find his ATM/credit
6  card from Bank of America. The victim stated that he
7  went to the bank and had the card cancelled on
8  February 19th, 2005. The victim also stated that on
9  today, February 24th, 2005, he was advised by the bank
10  that his account was overdrawn. The victim advised that
11  several transactions were made on February 18th, 2005,
12  using the Visa portion of the card."
13  Now, we've previously discussed the
14  February 18th, 2005, transactions, and those do not
15  appear to be unauthorized; is that correct? The
16  unauthorized transactions — strike that.
17  The unauthorized transactions actually appeared
18  to have taken place on the 22nd, beginning on the 22nd?
19  A On the 22nd? No, I don't think so. I think,
20  from this report, it appears that it was on the 19th of
21  February, and I gave him maybe, after I was arrested, on
22  the 18th.
23  Q Well, we went over the — we went over the ATM
24  statements before for the 18th and the deposit was
25  $700 —

1  A Right.
2  Q — which you acknowledged?
3  A Right, that one, I acknowledged.
4  Q And there was also the Winn-Dixie or the grocery
5  store which you believe you might have done with the
6  smaller portion of your ATM card?
7  A I believe I may have.
8  Q And we're not sure what the Hess Express is?
9  A Okay. Right. And there probably was some
10  transactions he probably made on that same day.
11  Q Those aren't on the statements. We reviewed the
12  statement. We can do that again, if you want, but that's
13  not on the statement.
14  A Okay.
15  Q The transactions that we're concerned with
16  principally began on the 22nd. That was all the empty
17  envelopes being deposited in the ATM machines, correct?
18  A I don't know if that's the exact date. This is
19  what Bank of America says.
20  Q That's on the statement.
21  A Right.
22  Q Okay. Now, your card was — you reported the
23  card stolen on the 19th?
24  A Right.
25  Q Is there any particular reason why you waited

1  until the 24th to report — to make the police report?
2  A No, there was no particular reason. Because I
3  went to the bank and I did talk with Eddie Corasco and
4  when he said that they were going to issue another card,
5  I was under the impression that they would change the
6  number and all and/or stop any actions from the ATM card
7  being used at the ATM machine. But then when I found
8  out that that didn't happen, then I was down in the bank
9  talking with bank personnel. I had to do that police
10  report, so we can help catch the perpetrator.
11  Q And you did not give the name of the perpetrator
12  to the police officer at this time?
13  A Not at that particular time. I think it was
14  later after I located the number, the cell phone number
15  and the name, then I took it back over to the
16  1700 Powers Avenue to the police department, and they
17  advised me that they would send an investigator to give
18  him that information.
19  Q Do you know if they ever prepared an updated
20  report — that the police prepared a report, maybe, that
21  would include the name of the wrongdoer?
22  A I don't know. I can't answer that question.
23  Q Now, do you know who told you that your account
24  was overdrawn?
25  A I think I received letters or something about

1 .the account being overdrawn.
2 Q Do you have any copies of those letters?
3 A I think I submitted everything to you that I
4 had.
5 Q All right. We didn't — we didn't receive any
6 copies of those. That's okay.
7 Do you know what time Officer Price came to
8 your residence?
9 A No. I don't recall.
10 Q Does about 2:30 sound correct?
11 A It said 1509. 1509.
12 Q That would be 3:09. That would be 3:09 p.m.
13 All right. Let's take a look at this letter
14 dated February 23rd, 2005, from Janet Hunter of Bank of
15 America, and this might be the letter that you were —
16 that you were referencing prior to the police report.
17 MR. PARRINO: Let's go ahead and mark this as
18 the next exhibit.
19 (Whereupon the above document was marked for
20 identification as Exhibit 5 and is attached hereto.)
21 BY MR. PARRINO:
22 Q Okay. Do you recall receiving this letter?
23 A Yes, I do. From Janet Hunter, yes.
24 Q Have you ever spoken to Janet Hunter?
25 A Yes, I have spoken to Janet Hunter on the phone

1 a few times, but it appears that she didn't want to
2 change her position regarding the account. I proceeded
3 to go over her head and call the CEO, Ken Lewis, which
4 he only referred me back to the regional management
5 department. And then after I was referred back to the
6 regional management department, I got the phone hung up
7 on me as soon as they heard my name.
8 Q Now, with regards to this letter, this letter
9 informs you that Bank of America has elected to close
10 your account; is that correct?
11 A Yes.
12 Q It also instructs you not to write any checks or
13 make withdrawals from the account?
14 A Right.
15 Q I don't believe that this letter actually
16 informs you that your account is overdrawn. But is this
17 the letter that prompted you to call the police
18 department?
19 A No. I was going to the bank — to the banking
20 center and I was conversing with the managers there
21 several times, and so —-and so when — then I guess
22 after that time, I decided to get the police involved in
23 order to clear up my name from these allegations that I
24 made false deposits with a bank envelope in an ATM
25 machine, some kind of a way of getting money, which I

1 don't know any bank that would — or machine that would
2 do that.
3 Q Right. I'd like to refer your attention to the
4 next set of documents. This is a Cardholder Fraud
5 Dispute Statement. It is dated March 3rd, 2005.
6 MR. PARRINO: And we'll go ahead and mark that
7 as the next exhibit.
8 (Whereupon the above document was marked for
9 identification as Exhibit 6 and is attached hereto.)
10 BY MR. PARRINO:
11 Q Do you recall executing this document?
12 A Yes. That's my signature on it.
13 Q And this document is dated March 3rd, 2005; is
14 that correct?
15 A Correct.
16 Q Can you tell me why you waited until March 3rd
17 of 2005 until filling out a fraud affidavit on your
18 account?
19 A Why did I wait until that time? I was trying to
20 help and get the information regarding this perpetrator.
21 I was trying to conduct my investigation, also. And
22 then — and then after that point, I think after I
23 couldn't make any further progress, I decided to notify
24 Washington, D.C., about it. I contacted
25 Washington, D.C. about that, and I was talking with them

1 also on the phone. They said that I should proceed and
2 do all kinds of disputes and things of that nature, and
3 they would send me a packet down. And I complied to
4 what they informed me to do.
5 Q Now, there's a few interesting things you said
6 there. First, by March 3rd, 2005, had you been able to
7 find the name of the perpetrator?
8 A I did find the name. I don't recall the exact
9 date, but I did find the name, the first name and the
10 cell phone number.
11 Q Was that before, or after, you filed this
12 affidavit?
13 A I'm not sure. I'm not sure. Then that's
14 probably — more than likely it could have been after, I
15 think, because then when I went to the police
16 department, to the substation, and reported it, and they
17 said go back to Bank of America. And there was so much
18 that was going back and forth, you know, between me and
19 the bank, and I'm there again getting documents and
20 giving them to the bank and asking them down in risk
21 management, Janet Hunter, and that's basically what I
22 was doing, trying to just get information that can help
23 the bank, so we can catch the guy.
24 Q What date did you go back to the substation; do
25 you recall?

1   A   I don't recall the exact date.
2   Q   How many days after the initial police report
3   was it?
4   A   I don't recall how many days after.
5   Q   Was it less than a week?
6   A   I don't recall.
7   Q   Was it more than a month?
8   A   I don't -- I don't think it was too much longer
9   than that. I really don't recall the exact date that I
10  went back to the police department, not unless they have
11  some kind of record of me coming back there.
12  Q   Now, who provided you with this Cardholder Fraud
13  Dispute Statement?
14  A   I'm not sure who provided me with this,
15  either -- either the bank, they may have done it, or
16  maybe -- more than likely it came through the mail. I
17  just don't recall which party sent me this document.
18  Q   Now, you also said you had contacted
19  Washington, D.C., regarding these fraudulent
20  transactions --
21  A   Yes.
22  Q   -- or the unauthorized activity on your account?
23  Who in Washington, D.C. did you contact?
24  A   I think it was the Federal Trade Commission, I
25  think it was, to where you report fraud, and they just

1   sent me a pamphlet about contacting the credit agencies,
2   you know -- I mean, the credit agency, yeah, contacting
3   them, and contacting, like, the credit reporting
4   agencies, actually.
5   Q   Now, attached to this fraud affidavit, you have
6   three sheets of transactions. Where did you get these
7   three pages?
8   A   I think these came from Bank of America.
9   Q   Is this your bank statement that you received in
10  the mail, or is this something you pulled off the
11  internet?
12  A   No. I didn't pull this receipt from Bank of
13  America. I don't use a computer.
14  Q   Okay. Now, I'd like to direct your attention to
15  the Page 3 of the fax --
16  A   Okay.
17  Q   -- to the first transaction on Page 3. It
18  stated February 2nd, 2005. That says $1,000. That
19  number has a line through it --
20  A   Right.
21  Q   -- and above that, it says "okay"; do you see
22  that?
23  A   Yes, I see that clearly.
24  Q   Did you put that there?
25  A   Yes, I did put that there.

1   Q   Why did you say okay to that?
2   A   I says okay -- I marked that okay, that Bank of
3   America said that I had a thousand dollar deposit on
4   there, but I made them aware of that I didn't have a
5   card and I didn't make that deposit. So if somebody
6   wants to give me a thousand dollars, I'm not going to
7   reject it, but I did not make that deposit, so I just
8   put okay, so they was aware of that. And any of those,
9   I did not make. I made them aware of that.
10  Q   Well, I thought the purpose of filing this
11  affidavit was to notify Bank of America of unauthorized
12  transactions, correct?
13  A   Well, I don't see that this is an affidavit.
14  Q   This was attached to your affidavit; is that
15  correct?
16  A   That's not in the form of an affidavit. It has
17  no language of an affidavit at all.
18  Q   I'm sorry. It's a dispute statement. But this
19  is attached to your dispute statement?
20  A   Yes.
21  Q   And it says, my --
22  A   Okay. Yeah, I have a notation on that to let
23  them know that those are not my transactions. Somewhere
24  there's a notation that I put informing them that --
25  Q   Unfortunately, we don't have a better copy of

1   that, but it's just -- I'm just curious to know why it's
2   the only --
3   A   Okay. What it says here, it says, "see attached
4   copy," my initials. States "my transaction," "others
5   not my transactions." So where my initials were, were
6   my transactions.
7   Q   And the only place that your initial is -- well,
8   that's over here on the side. I see.
9   A   Right, right, right.
10  Q   And there's a few of these transactions that
11  you've actually okayed on the -- apparently, on the 22nd
12  of -- on February 22nd, 2005.
13  A   Which ones?
14  Q   Well, the only ones that have your initials,
15  sir, are the -- there's a couple of Walgreen's. These
16  are all your initials, correct?
17  A   Right, right. Those are done with the little
18  small card, the key chain card.
19  Q   I understand that. I mean, it's just --
20  A   Yes, those are ones with my initials on it.
21  Q   But your testimony before is that on the 19th,
22  you had gone to Bank of America and told them to close
23  the card.
24  A   To close the ATM card that I can use with the
25  ATM machine. The little card, you can't use for the

1   machine.

2   Q I understand that. But you're aware that the

3   two cards are connected, that they access the same

4   account?

5   A But I still directed them to Eddie Corasco to

6   change the number on that -- on the card.

7   Q Are you aware that if -- to close the card, they

8   have to close all access to it --

9   A I wasn't aware of that. I wasn't aware of that.

10   Q So you weren't surprised then that you were able

11   to make purchases on the 22nd using your --

12   A Well, actually, Eddie Corasco told me that there

13   was a deposit of $500. I said, well I didn't make the

14   deposit of $500, so I said, are you sure? He says, yes,

15   there's a deposit of $500 on that account.

16   Q When was that?

17   A That was on the 19th, February 19th, so -- and I

18   informed him and said, no, I didn't make that deposit.

19   Q Can you turn to the last page of this -- of this

20   document, the four pages attached to this dispute

21   statement. Do you see your initials also on a couple of

22   transactions on the 23rd?

23   A On the 23rd?

24   Q I think there's at least two. There's one at,

25   apparently, a CVS on the 23rd --

1   A Yes.

2   Q -- and there appears to be one on the 23rd also

3   at CVS.

4   A Yes.

5   Q Those are also transactions that you

6   acknowledge?

7   A Yes. Yes, sir, because, like I said, the only

8   card that I had and Eddie Corasco know was the little

9   one. He says I can go ahead and use the little one.

10   And I figured that any information on use of the ATM

11   machine should be barred because I didn't have the ATM

12   card.

13   Q Now, when did you learn that Bank of America had

14   reported you to Primary Payment Systems?

15   A When I tried to open an account at Compass Bank,

16   which I opened an account there and -- yeah, I opened an

17   account with a check, a deposit check, and then they

18   came back and said, no, they can't open the account. So

19   I says, why? They said, well, Bank of America had put

20   some information out about you and we can't open the

21   account.

22   So I walked back across the street to Bank of

23   America and then I asked them about that, and I don't

24   know whether I gave them something to fax down to risk

25   management or not regarding that, but that's when I

1   first found out about the information where they said

2   that I abused an ATM machine by putting a blank

3   envelope, and I said, no, I never did that.

4   And so myself and the manager of Compass Bank

5   was talking about it. And then I received a document

6   from them showing that -- I think it was about three or

7   four different banks that I tried to do business with,

8   and it was all rejected. But I didn't know about what

9   was said until I went to Compass Bank and they provided

10   me with -- I believe there was -- they provided me with

11   that information that Bank of America informed Primary

12   Payments that barred me from opening any accounts.

13   Q What date was that?

14   A I don't recall the exact date.

15   Q What time of the year was that?

16   A That was -- let me think. It was a check I was

17   depositing. And it was during the daytime, obviously.

18   It was a check -- it was money that I had received in a

19   case, a settlement case, here in Florida -- what's her

20   name? It was -- I was doing a case against Williamsburg

21   Complex and we settled out and I was trying to deposit

22   that check, and I tried to open up an account depositing

23   that check that I received from what's her name -- she

24   has an office down there at Rogers Towers, but I can't

25   recall that attorney's name.

1   Q Okay. The question, though, was, the time of

2   year, was that spring -- would that be the spring or

3   maybe summer or fall, winter?

4   A Well, I don't recall.

5   Q That's okay. Now, when did you notify Primary

6   Payment Systems that you were disputing the information

7   that had been reported to it?

8   A I notified -- after I did complaints to the OCC,

9   is it -- with them, and I think that soon after I talked

10   with the people there that was investigating the actions

11   of the bank and I think they had denied it or they -- or

12   they couldn't find -- find the wrongdoing or something

13   of that nature, because I didn't submit some document,

14   so -- as a matter of fact, I didn't submit the time I

15   was released from the jail. They didn't have possession

16   of that. They wanted that and a copy of the property

17   that I had on me when I was arrested.

18   So I informed them that I didn't get any letter

19   from Bank of America requesting that, or I would have

20   provided that. I said, but I did receive an envelope

21   from Bank of America that had a blank piece of paper in

22   it, so -- so I went down to the pretrial detention

23   center and I got a copy of one of the exhibits showing

24   what I had on me when I got arrested, my credit cards

25   and things, and I submitted that to the office of the

1  president, Rene -- no, Rina --
2  Q Okay. I think you're misunderstanding my
3  question, sir. I think that's something that you
4  actually did later, maybe. But my question is, when did
5  you contact Primary Payment Systems regarding the
6  investigation -- requesting an investigation saying you
7  wanted to dispute the information that Primary Payment
8  Systems had on you?
9  A Well, that was around the spring or the
10  summertime of that same year, I contacted them, and I
11  talked to Mr. Overby, that's who I talked with, of
12  Primary Payments.
13  Q Okay. Let's take a look at this document.
14  MR. PARRINO: Let's go ahead and mark that as
15  the next exhibit.
16  BY MR. PARRINO:
17  Q This is a Consumer Questionnaire & Release Form.
18  A I remember that.
19  Q Do you recall doing that?
20  A Yes.
21  MR. PARRINO: We're going to mark that as the
22  next exhibit.
23  (Whereupon the above document was marked for
24  identification as Exhibit 7 and is attached hereto.)
25  MR. TRAUB: Can we take a two-minute break?

1  MR. PARRINO: No problem. We'll take a
2  two-minute break.
3  (Brief recess.)
4  MR. PARRINO: Back on the record.
5  BY MR. PARRINO:
6  Q Are you ready, Mr. Allmond?
7  A Yes, I'm ready.
8  Q Now, I think we helped you find that form.
9  A Yes. I found it.
10  Q Let's stay there right now. We'll go forward
11  from there. We'll start there.
12  Do you recall executing this document?
13  A Yes, I do.
14  Q What is the date on this document?
15  A 5-9-06.
16  Q Now, I'd like to direct you to the top of the
17  document. Was this document faxed from Compass Bank? Is
18  that why it says Compass Bank on there?
19  A Yes, I believe so.
20  Q So that might have been the date that you went
21  to open the account at Compass Bank?
22  A Yeah, I believe so. It could be --
23  Q Okay.
24  A -- around that time.
25  Q And you were living at Old Kings Road at that

1  point? You'd already moved?
2  A Obviously, yes.
3  Q Okay.
4  MR. PARRINO: I'd like to move to the next
5  document. Go ahead and mark that as Exhibit 8 please.
6  (Whereupon the above document was marked for
7  identification as Exhibit 8 and is attached hereto.)
8  BY MR. PARRINO:
9  Q The next document is dated -- is also dated
10  May 9th, 2006; is that correct?
11  A Yes, 2006.
12  Q Do you recall receiving this letter?
13  A Yes, I do.
14  Q Now, I'd like you to take a second to read over
15  that letter, just to acquaint yourself with the contents.
16  Let me know when you've had a chance to look at that.
17  A Okay. Yes. I recall this letter.
18  Q Now, this letter informs you that Primary
19  Payment Systems has reviewed their records; is that
20  correct?
21  A Yes, that's what this letter states.
22  Q And that they have verified the -- that the
23  information was correct, is that --
24  A That's what they allege.
25  Q Is that your handwriting at the top of this

1  document?
2  A Up here? Yes, that is.
3  Q Who is Ms. June?
4  A 602? I guess these were persons that I was
5  calling -- okay. The BA means that was the Bank of
6  America toll free number, I think. Yeah, that's Bank of
7  America toll free number, attention Ms. Jones. And her
8  number is 602-364-5850. And I'm a rather -- I was
9  talking with someone from Bank of America or
10  from Primary Payment regarding this information.
11  MR. PARRINO: Okay. I'm going to mark this
12  next document as Exhibit 9.
13  (Whereupon the above document was marked for
14  identification as Exhibit 9 and is attached hereto.)
15  BY MR. PARRINO:
16  Q Do you recognize this document, sir?
17  A Yes, I do.
18  Q Do you know when you received this document?
19  A I don't know the exact date that I received it,
20  but this is how I knew -- found out about the
21  information that was reported by Bank of America about
22  me.
23  Q Would this have been before you sent the fax
24  to -- or you filed your consumer questionnaire with
25  Primary Payment Systems?

1    A  I'm not sure. I can't recall if it was before
2   or maybe after.
3    Q  Now, let's go to Part 3, at the bottom there.
4    A  Okay.
5    Q  You have four banks listed there.
6    A  Right. They have -- yeah, they listed four
7   banks.
8    Q  They listed four banks there. Had you tried to
9   establish relationships with all those banks?
10    A  With all these banks, yes.
11    Q  Do you know when -- which was the first bank --
12   strike that.
13       Which was the first bank that you tried to
14   establish a relationship with?
15    A  I don't know which one of these were first, but
16   I have been to all these banks and tried to open up an
17   account.
18    Q  Do you know -- strike that.
19       Do you know who you spoke with at Primary
20   Payment Systems?
21    A  I spoke with Mr. Overby.
22    Q  Who is Mr. Overby? Do you know his position?
23    A  I don't recall his position.
24    Q  Do you know if Primary Payment Systems ever
25   referred your dispute to Bank of America for review?

1    A  I think Mr. Overby said that yes because Mr. --
2   when I was talking with Mr. Overby, he said he would
3   contact Bank of America about that dispute and see if
4   they can remove that information. And after I talked
5   with him again, he said Bank of America, they refused
6   to -- refused -- they was going to keep it there.
7       And in addition thereto, I talked to the
8   president of the office also, this -- what's her name --
9   Rina or something; I'm not sure -- but the president's
10   office of Bank of America. And I talked to a gentleman
11   also there several times, and they said that they was
12   going to keep the information there with Primary
13   Payments, but I didn't have to pay them any money back.
14   I said, well, wait a minute, I never touched that money.
15   And I said I'm demanding that you remove that
16   information about me because that's false information.
17   So that went back and forth --
18    Q  We're going to discuss that investigation. I'm
19   just trying to move chronologically forward in an orderly
20   fashion to keep the record clear for anything that needs
21   to be done, so we'll discuss that in the future. I'm
22   just kind of going document by document along with the
23   dates and just keeping this chronological.
24       MR. PARRINO: I'm going to go ahead and mark
25   the next document as Exhibit 10.

1       (Whereupon the above document was marked for
2   identification as Exhibit 10 and is attached hereto.)
3   BY MR. PARRINO:
4    Q  Do you recognize this document?
5    A  Yeah, I think so. Yeah, I do. That's my
6   signature.
7    Q  Now, this document is entitled Request to
8   Dispute Bank of America; is that correct?
9    A  Yes.
10    Q  Can you tell me the address to which you mailed
11   this document?
12    A  Is it, like -- it could have been faxed, I
13   think.
14    Q  Well, can you tell me the address that is at
15   the -- that is on this document?
16    A  That's PMB -- I think that's PMB 168,
17   6045 West Chandler Boulevard, Number 13, Chandler,
18   Arizona.
19    Q  Do you know whose address that is?
20    A  That had to be either one of the --
21    Q  You can refer to the previous document, if you
22   want to. That might clarify it for you, previously,
23   prior to that. I think it's actually in the bottom
24   corner.
25    A  Primary Payment Systems?

1    Q  It's in the bottom corner there, sir.
2    A  Okay. Down there. Okay. Primary Payment.
3    Q  Can you tell me what the purpose of this letter
4   was?
5    A  Yes. Okay. The intent of this was that I was
6   serving -- I was doing that dispute and I was informing
7   them if we can't resolve this, basically, and if the
8   information can be -- cannot be removed, I was giving
9   them notice of intent to sue against Bank of America in
10   support of our claim of the slanderous information that
11   was circulated.
12       And as you see at the bottom there, I put
13   please try to resolve this matter by 6-2-06, so I can
14   open an account, because I was really being hampered
15   because of this information that I was trying in every
16   way that I can to correct it.
17    Q  Can you tell me why you sent this notice of --
18   this request to dispute to Primary Payment Systems rather
19   than Bank of America?
20    A  Well, I have been sending information to Bank of
21   America. I had been talking with Bank of America, the
22   office of the President, Ken Lewis, Janet Hunter. I've
23   been going down to the local branch, and it appears that
24   they were just ignoring me, that I was repeatedly
25   explaining to them that I was innocent, but he just kept

1 ignoring me. And then when I was getting to the phone
2 calls, most of the time they would just slam the phone
3 down when I'd start talking with them.
4     MR. PARRINO: I'd like to go to the next
5 document and mark that as Exhibit 11, please.
6     (Whereupon the above document was marked for
7 identification as Exhibit 11 and is attached hereto.)
8 BY MR. PARRINO:
9     Q Now, this document I don't think was ever sent
10 to you personally. I believe this is a -- have you ever
11 seen this document before? Can you tell me that?
12     A Which document is that? No, I haven't received
13 any dispute/reinvestigations. No, I haven't.
14     Q I'd like you to take time to read that document
15 then, since this is the first time you've seen it. I'd
16 like you to go ahead and take the time to review that
17 document.
18     A Okay.
19     Q Do you know anything about that document?
20     A No, I don't recall this document.
21     Q Okay. Not a problem. We'll go past that one.
22 I'd like to go to this next -- the next document.
23     A Okay.
24     MR. PARRINO: Mark that as Exhibit 12.
25     (Whereupon the above document was marked for

1 identification as Exhibit 12 and is attached hereto.)
2 BY MR. PARRINO:
3     Q Do you recognize this letter?
4     A Yes, I do.
5     Q Do you --
6     A Excuse me.
7     Q So do you remember receiving this letter?
8     A Yes, I do.
9     Q What is the date of this letter?
10     A May 24th, 2006.
11     Q And what does this -- who wrote this letter to
12 you?
13     A It appears it came from Janet Hunter who I named
14 as a defendant, but I've been unable to get her
15 whereabouts. I requested that Bank of America provide
16 me her last known address or her W-2 forms, so she could
17 be served; however, they have not provided me with her
18 last known address as of yet. Janet Hunter is a very
19 important key in this litigation. I talked with her
20 several times. I faxed a lot of documents to her and
21 thus far, the Defendant, Bank of America, has not
22 revealed that last known address.
23     Q All right. What is Ms. Hunter telling you in
24 this letter?
25     A Well, Ms. Hunter is saying in this letter -- it

1 says: "Dear Mr. Allmond: Your dispute letter to
2 Primary Payment Systems, Incorporated, concerning the
3 closure of the above referenced account has been
4 referred to me for reply.
5     "We have performed a detailed review of the
6 account and found out the reason for closure is
7 accurate. Therefore, the decision to end the account
8 relationship and the reporting to ChexSystems,
9 Incorporation, and Primary Payment Systems is accurate
10 and will remain in effect."
11     And I oppose that. My allegation is that it's
12 not correct.
13     Q I understand that. But this is Bank of America
14 telling you that they have investigated -- that they have
15 done an investigation of the information in Primary
16 System's records; is that correct?
17     A The letter is saying that they did some
18 investigations, but they didn't assure the truth of the
19 information.
20     Q The letter does not -- the letter says that
21 they've determined that the information is accurate,
22 that's what the letter says?
23     A Well, that's what their letter says and that's
24 the same reason why nobody wants to give me Janet
25 Hunter's address, so that way she can be served as a

1 defendant.
2     Q Let's keep separate your allegations from the
3 bank's position. Let's just keep everybody's positions
4 separate. But I see there is a rebuttal letter and we're
5 going to talk about that next; okay?
6     A Fine.
7     Q So following receipt of this letter, did you
8 respond to the bank or to Early Warning Systems or
9 Primary Payment to dispute Janet Hunter's statements?
10     A Yes, I did.
11     Q And how did you do that?
12     A I did that by contacting Ken Lewis, a CEO, who
13 has the power to do a further investigation and to also
14 correct a wrong. And I contacted the office of the
15 President in addition thereto, to also take appropriate
16 action because their investigation is not proper.
17     Q I mean, this is all -- I'm trying to go orderly.
18 I was trying to get to your rebuttal letter.
19     A Sure.
20     Q The next immediate step you took was sending a
21 rebuttal letter; is that correct?
22     A Right. I did that, also, yes.
23     MR. PARRINO: Okay. Let's go ahead and mark
24 that as the next exhibit.
25     (Whereupon the above document was marked for

1  .identification as Exhibit 13 and is attached hereto.)
2  BY MR. PARRINO:
3  Q  Do you recall drafting this document?
4  A  Yes, I did.
5  Q  Who is Jamie?
6  A  Jamie? I believe, she must have been an
7  employee for -- I think that was the OCC, the
8  comptroller of banks -- of national banks, I believe.
9  Q  So you sent this letter to the OCC?
10 A  Yeah. This is regarding the investigation
11 and all -- the reinvestigation. It's either her or
12 Primary Payment Systems, one or the other. It looks
13 like both of them have the same -- well, both of them
14 are in Chandler down there, Chandler, Arizona.
15 Q  All right. What was the purpose of this
16 rebuttal letter?
17 A  Again, requesting that they remove the false
18 information that was published about me and that the
19 statement by Janet Hunter is not correct -- is not
20 correct, is untrue. And I wanted them to do a thorough
21 investigation, because it's simple, that if I'm in jail
22 when the first transaction took place, then I couldn't
23 be there, because I can't be in two places at one
24 time -- at the same time when that ATM was used. I was
25 never in those locations on those days and times.

1  And based upon that and based upon the police
2  report, I think that any reasonable person would have
3  come to their senses and said this guy couldn't have did
4  that, that he wasn't there and he can't be at two places
5  at one time, that the card was, in fact, stolen and he
6  didn't have the card. So they just -- it appears to me
7  that they just kept turning a blind eye and they just
8  wanted to hold me responsible for it.
9  Q  All right. I'd like to refer you to the next
10 document. Do you recognize that document?
11 A  Yes.
12 Q  What is that document?
13 A  This is -- this is a form I had to fill out, the
14 Comptroller of Currency, Administrator of National
15 Banks.
16 Q  Was that the first time you contacted them?
17 A  I contacted them -- I don't know if this is the
18 first time I contacted them or not.
19 Q  Do you know what date you filled that report out
20 on?
21 A  It looks like it's saying -- let me see that fax
22 number.
23 MR. PARRINO: Go ahead and mark this as a
24 composite exhibit.
25 THE WITNESS: Well, I have it signed

1  August the 25th, but I probably called them before that.
2  BY MR. PARRINO:
3  Q  What was the purpose of filing that document?
4  A  The purpose of filing this document was, I
5  guess, that I would assume that I was putting them on
6  notice of the lawsuit that I was filing -- I was going
7  to file against them.
8  MR. PARRINO: Go ahead and mark that as
9  Composite Exhibit 14.
10 (Whereupon the above document was marked for
11 identification as Exhibit 14 and is attached hereto.)
12 BY MR. PARRINO:
13 Q  What did the office of the Comptroller of
14 Currency do after receiving this letter, do you know, or
15 this complaint form?
16 A  Well, actually, the complaint form -- well, they
17 started the investigation, I guess, or they did -- let
18 me see. What did they do after this. They started
19 their investigations. And I think that they had closed
20 it because at the time when they -- when they closed it,
21 I didn't exactly have the date -- excuse me -- not the
22 date, but the time of my release from the jail. I just
23 received that document maybe, what, a couple of months
24 ago, one or two months ago, at the time that I was
25 released after going to the jail in Florida. Their

1  administrator office, because I needed that release time
2  of when I was released, they provided me that copy. But
3  they had already closed the case, actually, and so
4  then -- then they had told me that once I filed
5  litigation, that they couldn't be involved. So I said,
6  well, I'll just send a copy to the defendant's
7  attorneys.
8  Q  When the -- when the comptroller of currency
9  closed your case, did they deny your claim; is that what
10 they did?
11 A  Basically, because I didn't have all the
12 information that they needed and then I had already
13 started the lawsuit.
14 Q  Well, that's why they told you they wouldn't
15 reinvestigate, is that correct, because you started the
16 lawsuit, so they could not reinvestigate the claim?
17 A  Well, no. I wanted that reinvestigation. I
18 gave them ample time.
19 Q  Well, I understand you wanted that but they
20 said that they could not -- that the OCC could not
21 because the lawsuit -- litigation had started?
22 A  I can't say verbatim.
23 Q  Okay. I'd like to refer you to the next
24 document, which is a letter dated August 28th, 2006. And
25 we'll go ahead and mark that as Exhibit 15.

18 (Pages 66 to 69)

1     (Whereupon the above document was marked for
2  identification as Exhibit 15 and is attached hereto.)
3  BY MR. PARRINO:
4    Q  It's after all the OCC documents.
5    A  This one?
6    Q  Right there. Do you recall receiving this
7  letter?
8    A  Yes, I do.
9    Q  Who is this letter from?
10    A  From Janet Hunter.
11    Q  And what does Ms. Hunter tell you in this
12  letter?
13    A  Her position in this letter says: "Your dispute
14  letter to Primary Payment Systems, Incorporated,
15  concerning the closure of the above referenced account
16  has been referred to me for reply.
17     "We have performed a detailed review of the
18  account and found that the reason for closure is
19  accurate. Therefore, the decision to end the account
20  relationship and the reporting to ChexSystems,
21  Incorporation, and Primary Payment Systems is accurate
22  and will remain in effect."
23     And I opposed that. I objected to that because
24  it's not correct.
25    Q  But --

1    A  And it's her position --
2    Q  I understand that it's her position, but --
3    A  And, again, it appears that Janet Hunter -- Bank
4  of America, they all appear to be acting in bad faith
5  and ill will because they will not provide Janet
6  Hunter's last known address, so we can get her in here
7  on depositions and find out exactly what's going on with
8  the matter.
9    Q  This is the second time --
10    A  A scare tactic.
11    Q  I don't need your editorial comments.
12     This is the second time that you've received a
13  letter from Janet Hunter, correct?
14    A  That's a letter from Janet Hunter, but there's
15  no address that I can reply to Janet Hunter personally
16  on this matter.
17    Q  But it's the second -- the question was, this is
18  the second time she wrote you -- it's a yes or no
19  question.
20    A  It's typed, but I don't see her signature.
21    Q  So you acknowledged receiving it from her?
22    A  It could be and it could not, because I haven't
23  seen her typed it. I received a letter and I see it's
24  typed, but there's no signature.
25    Q  You acknowledge receiving this letter, though?

1    A  Yes, I did receive this letter.
2    Q  Okay. That's enough.
3    A  I'm objecting to it, though.
4     (Whereupon the above document was marked for
5  identification as Exhibit 16 and is attached hereto.)
6  BY MR. PARRINO:
7    Q  Let's look at the next -- the next letter, which
8  is dated August 29th. I'd like you to take a look at the
9  following letter. Do you recall receiving this letter?
10    A  Yes, I do.
11    Q  And who sent you this letter?
12    A  It appears to be Early Warning Services. It's
13  type written. There's no signatures on it.
14    Q  And the purpose of this letter was to inform you
15  that Early Warning Systems had completed a
16  reinvestigation of your claim; is that correct?
17    A  Yes. I asked them to reinvestigate.
18    Q  And that the results of the reinvestigation --
19  or that they also were stating that the information was
20  accurate, that in their opinion -- in their opinion, the
21  information was accurate; is that correct?
22    A  What they told me was they were basing it on
23  what information Bank of America gave them, per
24  Mr. Overby.
25    Q  Okay. And what is the date of that letter?

1    A  The date of this letter is August 29, 2006. And
2  I also claim that the same exhibits that's being marked
3  into exhibits, I will use as part of my claim.
4    Q  Right. I'd like to refer you to the next
5  letter.
6    MR. PARRINO: Go ahead and mark that as
7  Exhibit 17.
8     (Whereupon the above document was marked for
9  identification as Exhibit 17 and is attached hereto.)
10  BY MR. PARRINO:
11    Q  Do you recognize that letter?
12    A  Yes, I do.
13    Q  Do you recall receiving that letter?
14    A  Yes, I do recall receiving it.
15    Q  Do you know who Yvette Cook is?
16    A  It says at the bottom that she's from -- the
17  Executive Relations Officer, Office of the President.
18  That's for Bank of America.
19    Q  Did you ever contact anybody at the executive
20  relations office -- or the Office of the President?
21    A  Yes, I did.
22    Q  When did you first do that?
23    A  I don't recall the exact date.
24    Q  How did you obtain that phone number?
25    A  I think I received that phone number from the

1  OCC, I think, because this is where they said that they
2  had requested this information by booking receipts and
3  all, and I informed OCC that I did receive that letter
4  from them. I guess that was the first one — I did
5  receive an envelope with a blank piece of paper, and
6  then, I guess, I wound up getting this number and
7  calling them and finding out exactly what they needed
8  and also the OCC. And then I did get the booking
9  receipt and I submitted the booking receipt to the
10 Office of the President.
11     Q  When did you do that?
12     A  I don't remember the exact time, but I'm quite
13 sure that their executive relations office had the exact
14 date when I submitted the exhibits to them at their
15 request.
16     Q  Did you do that by November 28th, 2006?
17     A  I don't -- I don't think so, because I did
18 receive the first letter.
19     Q  And you do say where — you do see at the
20 beginning of the third paragraph where it says,
21 "Unfortunately, if I do not hear from you by
22 November 28, 2006, I will be unable to complete my
23 research and will not be able to accommodate your request
24 to resolve your concern"?
25     A  Well, as I stated to OCC, is that they never

1  mailed the letter out to me -- I never received the
2  letter — however, I'll go to the jail and I'll get the
3  information, and I did that and I did submit it to them
4  and then I think they did go back into it.
5     Q  When you say you never received the letter, what
6  do you mean you never received the letter?
7     A  The letter that they requested — the first
8  letter they requested for the booking receipt when I was
9  in jail.
10    Q  But you did receive this letter dated
11 November 7th?
12    A  I received one letter — I think this was
13 December 7th — November, December -- I received this
14 one after the fact, I believe. There was two letters.
15 One -- I never received the first one, and I think they
16 said that I was inquiring about it, and then I told
17 them, no, I never received anything from Bank of
18 America, just the one envelope with a blank piece of
19 paper. And they said that, well — because I thought it
20 had come from OCC, but they says, no, that probably was
21 something that Bank of America was trying to send you.
22 So I said, why would they send me a blank piece of
23 paper.
24        And so they — and so I think I wound up
25 calling the president's office again and asking them

1  about that and inquiring of them about it, and then I
2  did go down to the police department -- not the police
3  department, but down to the jail and I did get the
4  report and I did send it to them.
5        MR. PARRINO:  I'd like to go to the next letter
6  dated February 12, 2007.  We'll mark that as Exhibit 18.
7        (Whereupon the above document was marked for
8  identification as Exhibit 18 and is attached hereto.)
9        MR. TRAUB:  If I could just interject for a
10 second, it looks like you have the same letter on the
11 letterhead, if you wanted to put that one on the record.
12       THE WITNESS:  Yeah, I noticed that too.
13       MR. PARRINO:  Yeah, we'll put that in the
14 record also.
15       THE WITNESS:  I also noticed that on some of
16 these exhibits you gave me, 2 and 3 are the same
17 letters.
18 BY MR. PARRINO:
19    Q  Yeah.  That's what I was saying, there's
20 duplicate copies of that for whatever reason.
21       We're going to the February 12th, 2007, letter.
22    A  February 12th.  Okay.
23    Q  Do you recall receiving this letter?
24    A  A February 12th.  Did she write me?  You know, I
25 don't recall this letter, actually, because I'm looking

1  at her signature and I don't recall — I know we talked.
2  I think this was a letter that I didn't timely receive,
3  I think.
4     Q  So you received the other one timely then,
5  November 7th letter.
6     A  Let me rephrase that.  Okay.  That's the letter
7  that I didn't receive.
8     Q  Which is the letter --
9     A  It says, "As stated in our previous letter dated
10 November 7th, 2006, enclosed for your review, you were
11 required to provide additional information that
12 supported your dispute by November 28th."
13       Okay.  That letter that they sent me that I had
14 to respond by November 28th, I don't think -- that's a
15 letter that I didn't receive, and so that's why I had to
16 find out exactly what they wanted.  And then when I did
17 find out exactly what they wanted later, then I went
18 within the time period -- the new time period and
19 provided them with that additional information.
20    Q  But you recall receiving this February 12th
21 letter?
22    A  Well, I have it now, but — but when they — but
23 the letter that was requested, I never received it.
24    Q  But is that the November 7th letter or the
25 February — I'm not following which letter you're saying

1  you never received. Did you or did you not receive the
2  February 12th letter to -- when it was mailed to you?
3      A  No, I don't recall. I don't recall. I'm not
4  sure.
5      Q  Is that a no, you didn't receive it?
6      A  I don't recall.
7      Q  Okay.
8      A  Because I know one letter that I did receive by
9  a certain deadline and when I called the OCC to inquire
10  about it, they said that Bank of America requested some
11  additional information and that you didn't send it, and
12  I says, no, I didn't receive anything from Bank of
13  America.
14      Q  Did you ever speak to Rene Bjelic?
15      A  Yes, I sure did.
16      Q  When did you speak to her?
17      A  I don't recall the date, but I had spoke with
18  her more than one time.
19      Q  Was that prior to the receipt of this letter?
20      A  I think I talked with her after I talked with
21  OCC regarding the allegations that Bank of America said
22  that they -- that they mailed out. And I called her and
23  told her, no, I never received anything from Bank of
24  America, only an envelope with a blank piece of paper in
25  it. That's all that I received.

1      Q  Would that then be after February 12th, 2007?
2      A  I'm not sure. But I have talked with Rene
3  several times.
4      Q  Before -- but you don't know if it was before or
5  after February 12th, 2007?
6      A  No, sir, I don't.
7      Q  And by this point, by February 12th, 2007, you
8  would have known who the perpetrator was?
9      A  If they would have preserved the material
10  evidence, the video surveillance tape which I could have
11  identified the guy and -- or if they would have
12  preserved his number, his cell phone number that I gave
13  them, I'm quite sure we would have been able to -- you
14  know, they would have been able to track him down
15  through his cell phone.
16      Q  You didn't keep a copy of that information for
17  yourself?
18      A  Well, through all the moving around that I've
19  been doing from one place to another place, a lot of my
20  documents got misplaced.
21      Q  But from what I can see at this period of time,
22  it was a considerable amount of time that you lived at
23  Old Kings Road South; is that true? I mean, these
24  letters have been going back a while. It looks like
25  you've been at Old Kings Road South for several months

1  now. You were there in August 2006. You were still
2  there in February of 2007. Is that correct? When did
3  you move to Old Kings Road South?
4      A  Old Kings Road South? I think it was sometime
5  in October or November -- November 1st, 2005, 2006 --
6  2005, I think it was.
7      Q  All right.
8      A  And just for the record, also there was problems
9  with mail coming over to that address, because when I
10  was in litigation with Virginia Norton, I had informed
11  her, I believe, to where as there was problems with some
12  of the mail that, in fact, she was even sending me.
13      Q  What sort of problems with the mail, sir?
14      A  I don't know. But sometimes the envelopes would
15  be open. They appeared to be tampered with. And some
16  letters she said she would send me that I didn't get,
17  and I would call her because me and her, we were already
18  in contact with each other by phone a lot.
19      Q  So somebody at the postal service or elsewhere
20  along the route was tampering with the mail?
21      A  Probably so.
22      Q  Ms. Norton wasn't tampering with the mail?
23      A  No, no, surely not. But I know I noticed that
24  prior to even in my other cases. And as a matter of
25  fact, even at the address we're at now, my wife said

1  they gave two keys to the mailbox, but I said, no, but
2  only one key opens this mailbox. The other key doesn't
3  work. So I don't know where the other original key to
4  the mailbox is, so I'm going to recheck obviously on
5  that. I said, why would they give me two different
6  keys.
7      Q  Okay. Let's go to the next -- the next
8  document.
9      A  Okay.
10          MR. PARRINO: Let's mark that as Exhibit 19,
11  please.
12          (Whereupon the above document was marked for
13  identification as Exhibit 19 and is attached hereto.)
14  BY MR. PARRINO:
15      Q  Now, do you recognize this document?
16      A  Yes, I do.
17      Q  Is this document in your own handwriting?
18      A  Yes, it is.
19      Q  What is the Consumer Assistance Group?
20      A  The Consumer Assistance Group, I believe, is an
21  organization that investigates banks to see if they're
22  in compliance, I guess, with their procedures and laws
23  and rules and whatever they do. I'm not sure.
24      Q  I'm looking at the first sentence of this
25  document. It says, "I hereby appeal the letter dated

21 (Pages 78 to 81)

1  February 13, 2007, closing the case."
2  A  Right.
3  Q  Would that be referring to the letter from
4  Rene Bjelic?
5  A  I'm not sure. Wait a minute. Yes, right here,
6  it says, the second -- "I hereby appeal the letter dated
7  February 13, 2007, closing the case. Bank of America
8  did not respond directly with me in writing or by phone
9  requesting a copy of a booking receipt from
10  February 18th, 2005."
11  Okay. So that's pretty much clear. And, yeah,
12  that's what that was about: I didn't receive that
13  letter.
14  Q  And when was this sent to the Consumer
15  Assistance Group?
16  A  Like I said, it was March 20th of 2007.
17  Q  So this was over a month after you received the
18  letter from Bank of America?
19  A  Well, that particular letter, I did receive.
20  That's why I'm appealing them --
21  Q  A month after you received the February 12th
22  letter?
23  A  A month after the February 12th -- well, like I
24  was stating, that this is responding to them closing the
25  account. Yes, I did receive that particular letter. I

1  don't believe -- and they had closed the case and I
2  argued that I never received anything from them.
3  And I also -- and I also put I request that
4  Bank of America release the said documents to the
5  Customer Assistance Group within days, because Bank of
6  America did have other documents in their possession
7  that I made OCC aware of. And they said I had to notify
8  Bank of America in addition thereto to release those
9  documents. And I -- and I did request that.
10  In the past, I have requested for a copy of all
11  documents in the file, and since that time, they've just
12  hung up the phone on me whenever I called and no
13  documents yet has been given to me. So I'm informing
14  them that Bank of America is even resisting giving me
15  documents, and as well as the Consumer Assistance Group
16  documents that they have in their possession that's
17  relevant.
18  Q  Now, what I'm having trouble understanding here,
19  sir, is that you said that you didn't receive the
20  February 12th -- February 12th letter. So you're
21  appealing a letter that you never received? Is that what
22  you're -- I mean, are you saying you didn't receive a
23  letter from Rene Bjelic --
24  A  Right.
25  Q  -- and you're appealing --

1  A  Well, no. I'm appealing the fact that my
2  account was closed with them. The case was closed. "I
3  hereby appeal the letter dated February 13, 2007,
4  closing the case."
5  In other words, the assistance group closed my
6  case on February 13th, so I'm appealing that and saying,
7  no, I never received any document from Bank of America.
8  Bank of America has to have the information.
9  Q  When was the -- if you didn't receive this
10  letter from Rene Bjelic, how did you know to even contact
11  her?
12  A  Through -- the customer assistance group gave me
13  the information to contact her.
14  MR. PARRINO: Can we get a copy of this,
15  please?
16  MR. TRAUB: Well, that's actually three copies.
17  MR. PARRINO: That's three copies of the same
18  letter?
19  MR. TRAUB: Yeah.
20  MR. PARRINO: That's fine then. We can go
21  ahead and mark this.
22  (Whereupon the above document was marked for
23  identification as Exhibit 20 and is attached hereto.)
24  THE WITNESS: Yes, I remember this letter.
25

1  BY MR. PARRINO:
2  Q  Okay. And this is the letter that you're
3  appealing from -- in your notice of appeal, this would be
4  the letter that you're appealing, correct?
5  A  Yes, this is -- this is when they stated that
6  Bank of America -- "The OCC contacted the bank, which
7  responded directly to you. The bank advised you that in
8  order to investigate your claim, it would need a copy of
9  the booking receipt from February 18th, 2005."
10  Okay. And I informed her that the bank did not
11  contact me directly requesting the booking information.
12  I also stated to them if they would have requested it, I
13  would have went down to the jail and requested that
14  information for them. And so later I did go down, when
15  I made them aware of it, and I contacted the main
16  office -- well, the office of the president about --
17  about that statement that -- the letter that they
18  alleged that they sent to me where they contacted me,
19  that didn't happen.
20  If they did talk with somebody, it wasn't me.
21  However, I will be more than happy to go down to the
22  jail house and get that information. And I did go down
23  to the jail house and I did get the information and I
24  did submit it to them.
25  Q  So then you're stating that you never received

1  any of the letters from the executive relations office of
2  Bank of America?
3  A  That particular letter in question regarding
4  that they wanted the time of booking, no, I did not
5  receive the first one.
6  Q  But you did, or did not, receive the second one,
7  the February 12th letter?
8  A  I'm not sure. I really can't recall. But I
9  know when I did send in the information, they did review
10  it over again. And then they said that they was going
11  to close it again because I didn't provide the time when
12  I was released, so they needed the time. And I just
13  recently got — got that, but I didn't send that to them
14  because the lawsuit was filed.
15  MR. PARRINO: All right. I'm going to go to
16  the last exhibit I have here. It's going to be
17  Composite 21.
18  (Whereupon the above document was marked for
19  identification as Exhibit 21 and is attached hereto.)
20  BY MR. PARRINO:
21  Q  Do you recognize this document? Is that your
22  handwriting on here?
23  A  Yes. Let me see that. Yeah. This is from the
24  Heartland, yeah. It was faxed. They faxed it to me —
25  for me.

1  Q  Were you in Heartland at the time this was
2  faxed?
3  A  Yes. I had knee surgery and I did a little
4  physical therapy there.
5  Q  Now, who did you fax this to?
6  A  If I can find the document to refresh my memory.
7  If I can look at yours, I can — okay. Here it is.
8  Heartland.
9  Yes. I faxed this to — a copy of this went to
10  the president's office, I think, of Bank of America and
11  a copy went to OCC.
12  "Please find enclosed the JSO Department of
13  Corrections Property Record Receipt of date 2-18-05 of
14  property at time of arrest.
15  "You have my consent to demand from Bank of
16  America and Janet Hunter, risk identification and
17  support all disputed letters and documents. Further,
18  any and all checking or savings account statements. And
19  now the E-claim may go forward."
20  Because it appears that Bank of America, again,
21  was resisting to provide all the documents and
22  information, and so they — and so they're still doing,
23  with Janet Hunter's not providing her information,
24  whereas she can be served with a summons. So a copy of
25  this went to both parties.

1  Q  Now, this is the — this is your appeal that you
2  said that the office of the comptroller declined to take
3  up because you had already commenced litigation against
4  Bank of America; is that correct?
5  A  No. I think — I think on this one, after the
6  first appeal was denied, then I think I re-appealed, so
7  it was in limbo, I think, because I don't think that I
8  was receiving it yet in this case. I'm not sure. But I
9  was developing the record also for them.
10  Q  Okay.
11  A  But the last document that they needed was the
12  time. No, I didn't submit that because the litigation
13  was up and going, but I was — but I like to try to
14  create paper trails, because a lot of times documents,
15  they get lost and they get misplaced and things of that
16  nature, as is appearing with Bank of America.
17  Furthermore, I requested for the surveillance
18  tapes from the ATM machines through the proper channels
19  of discovery and I haven't received any of those — of
20  the —
21  Q  That's not an issue that needs to be taken up on
22  the record, sir. That's something we can discuss later
23  outside the deposition.
24  A  It's relevant to the subject matter. I've been
25  requesting for the videos and surveillance tapes. And I

1  think in one of your interrogatory responses, Bank of
2  America stated that they didn't have them. They don't
3  have the video surveillance photos. They don't have any
4  type of taped conversations. And I find that ironic,
5  and I'm demanding that Bank of America produce that —
6  this material that's relevant.
7  Q  All right. Now, sir, why are you suing Ken
8  Lewis in this lawsuit?
9  A  Ken Lewis?
10  Q  Yes.
11  A  I'm suing Ken Lewis because I talked with him on
12  the phone to try to get this resolved, and it appears
13  that he gave me another number to call, which referred
14  me back to risk management and they just hung up the
15  phone on me.
16  I tried to call Ken Lewis back. He wouldn't
17  even respond after that. And so I said, well, wow, why
18  all of a sudden I'm just getting the phone just hung up
19  on me over and over and over. Nobody wants to talk to
20  me. So I figured that being that he was CEO, he does
21  have some influence over his subordinates and it appears
22  that he just turned a blind eye. Because I'm innocent
23  of it. I did not —
24  Q  How did you get Mr. Lewis' phone number?
25  A  How did I get Mr. Lewis' number? How did I get

1  his number? I was doing a lot of calling around to a
2  lot of different banks, Bank of America, different
3  locations. I had a list -- I don't have it with me
4  now -- of all different banks, locations for Bank of
5  America, and I was inquiring, you know, who was
6  supervisors, who was over risk management, things of
7  that nature, and I would talk to different persons --
8  personnel of Bank of America from different places, and
9  someone gave me his name and that's how I wound up
10  calling him.
11  Q  Someone gave you his name --
12  A  Yeah.
13  Q  -- or his phone number?
14  A  His phone number.
15  Q  Somebody from Bank of America gave you his phone
16  number?
17  A  Yes. Yes, they did, for his office number.
18  Q  His office number?
19  A  Yeah.
20  Q  Is that the Office of Executive Relations' phone
21  number?
22  A  No, I don't think so. Someone gave me that
23  number, and I did take detailed notes on that. Once I
24  received his name on contacting Lewis -- he's the CEO of
25  Bank of America -- that's what I did.

1  Q  And Mr. Lewis actually took the time to take
2  your call?
3  A  Yes. He did talk to me over the phone very,
4  very briefly. But I was just referred back to risk
5  management, and that's when a lot of the hanging up on
6  the phone and slamming the phone began. So I don't
7  know -- you know, and so -- and when I called them back,
8  tried to call them back, I couldn't get through.
9  Q  Do you have any written proof that you spoke to
10  Mr. Lewis?
11  A  Well, the only written proof -- I don't have any
12  kind of written proof, but the only thing that would
13  reveal that I called him would be phone records.
14  Q  Do you have those phone records?
15  A  I don't have the phone records.
16  Q  Can you get those phone records from Bank of
17  America for us?
18  A  I don't have anybody to get them. I don't have
19  any access to them. They're -- a nonparty has them.
20  Bell South has them.
21  Q  Now, you're suing -- you are suing Ken Lewis,
22  you said, because of his position as CEO of Bank of
23  America and because of his inability to oversee his
24  subordinates?
25  A  I'm suing Ken Lewis because he had response --

1  supervisory responsibility. He knew of a constitutional
2  wrong that I explained to him, and he failed to take
3  appropriate action to correct the wrongs by his
4  subordinates and, therefore, he could be liable, because
5  he knew and he failed to take reasonable action. He
6  just ignored me.
7  Q  He had supervisory authority as the CEO of Bank
8  of America?
9  A  He has more than supervisory authority as CEO.
10  Q  But his authority derives from being CEO of Bank
11  of America?
12  A  Yes, yes.
13  Q  Now, these are just a few questions I ask every
14  person I depose. It's not to be offensive to you or
15  anybody else, but have you ever been arrested, sir?
16  A  Yes, I have.
17  Q  How many times have you been arrested?
18  A  In Florida, several times. I can't even count.
19  I don't know how many times, but several times, yes, I
20  have.
21  Q  And that's just in the short period of time
22  you've lived here?
23  A  Up until -- if you call four years a short
24  period of time.
25  Q  Were you ever arrested in the Commonwealth of

1  Virginia?
2  A  No.
3  Q  Have you ever been arrested in the state of
4  New Jersey?
5  A  Yes.
6  Q  Have you ever been incarcerated in the state of
7  New Jersey?
8  A  Yes.
9  Q  Have you ever been convicted of a crime in the
10  state of New Jersey?
11  A  Yes.
12  Q  How many years -- how much time did you spend in
13  jail in the state of New Jersey?
14  A  The most time I ever spent was about four years,
15  I think.
16  Q  Were you ever incarcerated for armed robbery in
17  the state of New Jersey?
18  A  Yes. I did about -- I think I served about
19  close to four years for armed robbery.
20  THE WITNESS:  Objection to -- I'm objecting to
21  it. This is going back way beyond 10 years. But, yes,
22  I have.
23  BY MR. PARRINO:
24  Q  With regards to the state of Florida, have you
25  ever been arrested for forged -- passing forged checks?

1     A   No forged checks.  They were my checks, two
2   checks that I had.  They were worthless checks.
3   Worthless checks.  Twice.
4     Q   Does that mean the checks bounced, or what does
5   that exactly mean?
6     A   That means that I didn't have the money to cover
7   the check.  But they were my checks.
8     Q   How many times -- what else have you been
9   arrested for in the state of Florida?
10    A   You mean convictions?
11    Q   Convictions, yes.
12    A   That -- right now, on the battery, domestic
13  battery, that's still pending.  I pleaded no contest.  I
14  was under duress when I pleaded on that one.  I was
15  sentenced to probation in the batteries program, but I'm
16  going back to court on the 2nd of June to retract my
17  plea and motion to dismiss on prosecutor misconduct, and
18  that the state doesn't have a victim.  The victim
19  submitted an affidavit that I didn't do it, that I did
20  not push her.
21    Q   Did anybody push her?
22    A   No, nobody pushed her.  So I have that.
23  That's -- what was the check --
24    Q   Were you ever arrested for anything involving
25  drug paraphernalia?

1     A   Yes, drug paraphernalia.  Those have dropped.  I
2   was arrested, but those were dropped.  And as a matter
3   of fact, there's a false conviction on my record now
4   to -- whereas I just gave notice of intent to sue to one
5   of the clerks -- for a CDS possession, and they said I
6   did 27 days.  I said, no, that never happened in
7   Florida.  So I gave them those that -- I talked with the
8   supervisor.  I talked with Virginia Norton, general
9   counselor, and she said she didn't know how that got on
10  my record, but that wasn't supposed to be there, because
11  I was never convicted or sentenced for a drug possession
12  hearing in Florida.  So now -- so I'm trying get that
13  cleared up now.  So I did give the county notice and
14  that clerk who sent that information down to motor
15  vehicle of a conviction that I never even had.
16        MR. PARRINO:  All right.  I have no further
17  questions at this time.  If Mr. Traub has any questions,
18  he's free to ask.
19        MR. TRAUB:  Okay.  Are you okay to keep going,
20  or do you want to take a break?
21        THE WITNESS:  We can keep going.
22              CROSS-EXAMINATION
23  BY MR. TRAUB:
24    Q   Mr. Allmond, my name is Seth Traub.  I represent
25  Early Warning Systems here in this case.  I did,

1   quick, want to put a couple of things on the record here,
2   just to supplement what has already been put in the
3   record, real quickly.
4         Exhibit 12 is a letter that you say -- or that
5   you acknowledge you received.  It's from Janet Hunter of
6   Bank of America to you and to the Old Kings Road
7   address, stating that Bank of America performed a
8   detailed review and found the reason for closure is
9   accurate.  We've already discussed that at length.  But
10  you had also acknowledged, using this same exhibit as an
11  exhibit to one of your motions or responses, and so I
12  just wanted to put the actual executed copy signed by
13  Janet Hunter into the record, just to clean things up.
14        MR. TRAUB:  So here's a copy of that.  That
15  would be Exhibit 22.
16        (Whereupon the above document was marked for
17  identification as Exhibit 22 and is attached hereto.)
18        MR. TRAUB:  And then also, again, for
19  Exhibit 17, an executed copy -- or not executed, but
20  it's on Bank of America letterhead, this is, I think,
21  just in your packet, so you should have a copy of this,
22  the November 7th, 2006 --
23        MR. PARRINO:  Yeah.  It's been put in, but we
24  can put it in again.  It's attached to the previous
25  Exhibit 17.

1         MR. TRAUB:  Okay.  So Exhibit 17 is two pages.
2   One is a form letterhead of Bank of America and the
3   other is not.
4         MR. PARRINO:  We'll go ahead and staple that
5   together.
6         MR. TRAUB:  Yeah, that's fine.
7   BY MR. TRAUB:
8     Q   You just had said some of these were not
9   executed and so you had concerns about them.  Well, a lot
10  of them are executed, and you have used some of them
11  already in your pleadings.
12        I believe the ones that have numbers on the
13  bottom, the 1 dash and then numbers, are the ones that
14  were submitted to you during discovery from Early
15  Warning.  Those are copies in their records that may not
16  necessarily be on their own letterhead, but you have
17  knowledge of their existence.
18        And, again, Exhibit 15 is similar, but
19  Exhibit 15 -- there's a copy of it on Page 3 of
20  Exhibit 21, so, you know, just so that we're clear.
21  There are executed copies and to the extent that you
22  have concerns about that, most of these are already in
23  the record.
24    A   All right.
25    Q   First, I've got a letter here that I do not

1 believe was in the record already. Let me just
2 double-check here. No, it's not. Good. This is a
3 letter dated May 24th, 2006, directed to you -- it's not
4 in that packet. I'll have a copy of it for you from
5 Primary Payment Systems. It was attached to, again, one
6 of your motions. On the bottom it says Exhibit 4-A. For
7 the purpose of the deposition, it will be Exhibit 23.
8     (Whereupon the above document was marked for
9 identification as Exhibit 23 and is attached hereto.)
10 BY MR. TRAUB:
11    Q  And this is a letter to you from Primary Payment
12 Systems. And if I could, it says -- and please correct
13 me if I'm wrong. Just reading direct from it, that
14 they -- "We have received your request for dispute
15 regarding the information contained in your consumer
16 report and we have completed a reinvestigation of your
17 file. The results of our reinvestigation confirm that
18 some of the information you provided to Compass Bank was
19 reported by another financial institution. And if you
20 feel this investigation does not resolve the dispute, you
21 may add a brief statement to your file."
22     Now, it says in there that Primary Payment
23 Services conducted a reinvestigation; is that correct?
24    A  That's what the letter says.
25    Q  Okay. And, now, our client notified you via

1 this letter that a reinvestigation could take place.
2    A  That's what it said.
3    Q  So if it says it took place, do you have any
4 basis to believe that it didn't?
5    A  Well, my basis is that they didn't assure the
6 truth of the facts, the statements, because I'm looking
7 at -- or I'm considering it the way a reasonable person
8 would probably think, or even a lay person would think
9 when you review the evidence: If they say this person
10 did this and that at this date and time and the person
11 is confined in jail, he can't possibly do it, so,
12 therefore, I felt as though they -- they failed to
13 thoroughly reinvestigate all the facts.
14    Q  So your opinion is that the reinvestigation
15 wasn't good enough?
16    A  Well -- well, they allege that they
17 reinvestigated it, but then, again, in talking to
18 Mr. Overby, he was just basing everything pretty much on
19 what Bank of America said. And I find that Bank of
20 America did not follow reasonable procedures.
21    Q  But didn't you also provide all the information
22 that you had in the --
23    A  The information that I had, I provided to them.
24 I've bent over backwards giving them information trying
25 to aid --

1    Q  But you have no reason to believe that a
2 reinvestigation did not actually occur?
3    A  Well, obviously, it appears that I don't think a
4 thorough reinvestigation occurred because they still
5 relied upon --
6    Q  Well, I understand that --
7    A  They should have done an independent
8 investigation and/or look at all the facts. The facts
9 would show that I wasn't at any of the places.
10    Q  This is a simple yes or no question.
11    A  I don't think they did a complete
12 reinvestigation, no, I don't.
13    Q  A complete one. But you don't know whether they
14 didn't do one at all?
15    A  Well, all I can go on is what they stated in the
16 letter.
17    Q  So you have no reason to believe that they
18 didn't do a reinvestigation at all?
19    A  I believe that they didn't do a reinvestigation
20 simply because, as I stated, that if they would have
21 done a reinvestigation, they would have concluded that,
22 okay, the guy was in jail, the guy couldn't have been at
23 this place versus all the other places that Bank of
24 America said.
25    Q  Well, let's go back to that then.

1    A  It wasn't --
2    Q  You were in jail on the 18th and you were out on
3 the 19th?
4    A  Right.
5    Q  Let's go back to Exhibit 2. I'm looking at all
6 these deposits that were empty envelopes --
7    A  Right. None of them were mine.
8    Q  -- that you allege were not made by you.
9    A  None of them.
10    Q  But all of these deposits were made on -- one on
11 the 18th, two on the 19th, one on the 20th, two on the
12 21st, one on the 22nd. Were you in jail during those
13 times?
14    A  No. I didn't have -- my card was reported
15 stolen.
16    Q  I understand. So you're saying that -- you just
17 said to me that Early Warning would think, as a
18 reasonable person, that someone in jail couldn't make
19 these empty deposits, when you weren't in jail at that
20 time.
21    A  When you look at the first transaction that
22 happened at 2 a.m. in the morning, when I talked with
23 Bank of America, they said that person's transaction,
24 unlawful transaction, took place at 2 o'clock in the
25 morning. At 2 o'clock in the morning I was in jail. I

1    .wasn't released until 2 p.m. that -- that same day. I
2    can't be in two places at one time. So based upon that
3    fact and based upon the fact that I reported the card
4    stolen, Bank of America should have closed any kind of
5    action used at that ATM before it even escalated to all
6    this, and that was on the 19th.
7        Q   And you also testified that you continued to use
8    your mini ATM card.
9        A   Yes, I did use the small one, based upon the
10   information from -- from Eddie Corasco that there was
11   money deposited in that account, but at the same time I
12   made them aware I didn't make that deposit.
13       Q   Actually, let's talk generally about your
14   deposit history. You're saying you didn't -- you
15   continued to use this card after these alleged deposits.
16       A   No, I did not use the ATM automatic teller
17   machine card. I didn't have one.
18       Q   You used the mini credit card -- the mini card
19   that was connected to your debit account?
20       A   Yes, I used that.
21       Q   Okay. You used that, though, even though you
22   had a negative balance on your account.
23       A   Eddie Corasco told me on the 19th that it wasn't
24   negative, and I made them aware that I didn't -- I
25   didn't make any deposits.

1        Q   Let me go back to the packet that counsel
2    provided.
3        MR. TRAUB: Let me go ahead and put these in
4    the record as Exhibits 24 and 25.
5        (Whereupon the above documents were marked for
6    identification as Exhibits 24 & 25 and is attached
7    hereto.)
8    BY MR. TRAUB:
9        Q   The first, Exhibit 24, will be statement period
10   from January 11th, '05, through February 7th, '05. If
11   you want to take a look at that in that packet there. It
12   shows a beginning balance of negative $108.75 and an
13   ending balance of a negative $124.79?
14       A   Uh-huh.
15       Q   So you knew you had a negative balance on your
16   February 7th statement?
17       A   February 7th statement?
18       Q   Uh-huh.
19       A   Okay. I'm listening. Go ahead.
20       Q   That's a yes or no question.
21       A   I knew I had a negative balance -- yes, I knew
22   there was a negative balance at first, yes, before there
23   was the $700 check deposited.
24       Q   But the $700 check deposited wasn't yours?
25       A   No. The $700 was not mine.

1        Q   Right. Okay. And then Exhibit 25 --
2        MR. TRAUB: Do you want to mark these from your
3    copies?
4        MR. PARRINO: Yeah, go ahead. This is
5    Exhibit 24, the first one, and then 25 is the second
6    set?
7        MR. TRAUB: Yeah. 25 would be the statement
8    from December 14th, '04, through January 10th, '05.
9        THE WITNESS: The balance summary, you're
10   talking about?
11   BY MR. TRAUB:
12       Q   Just keep going. A whole new statement. There
13   you go.
14       A   Okay.
15       Q   And that would be a statement from
16   December 14th, '04, through January 10th, '05. And then
17   your account at a glance says that you have a beginning
18   balance of negative $138 and an ending balance of
19   negative $108.
20       A   Is this a credit card or this is the --
21       Q   This is your checking account statement.
22       A   Checking account. There was a deposit of
23   $679 -- there was deposit of $679 on there, also.
24       Q   Well, we're not -- you haven't alleged anything
25   here in any of these two statements or anything

1    fraudulent was happening. You still had possession of
2    your ATM card here.
3        My question is only that you had a negative
4    balance running for two months and you had told me that
5    you didn't know you had a negative balance.
6        A   Yes. Well, every month, when I got my check, I
7    was taking it -- and I think that's what I was making my
8    deposits with.
9        Q   But not having enough money in the account
10   didn't stop you from using the account.
11       A   Okay. Continue.
12       Q   We got sidetracked there. But let's go back to
13   Exhibit 2 and, actually, Exhibit 6 as well. Exhibit 6, I
14   believe, is a cardholder fraud dispute statement where
15   you attached -- where you said or you acknowledged
16   statements that are -- or charges that are okay and some
17   that are bad.
18       A   Okay.
19       Q   And you testified before that the 2-18-05 date
20   is kind of the threshold date where you last used your
21   card, your actual ATM card, at an ATM; is that correct?
22       A   Excuse me. Could you repeat that?
23       Q   February 18th, '05, when you made the $700
24   deposit --
25       A   Yes.

1    Q  — that was the last time you actually used the
2  ATM card?
3    A  Yes.  The ATM card, yes.
4    Q  So everything before that is a correct charge;
5  is that correct?
6    A  What charge?
7    Q  Looking at Exhibit 6.
8    A  Okay.  I'm looking at this exhibit here, the one
9  where I signed off.
10    Q  The cardholder fraud dispute statement?
11    A  That's what I have right here.  Okay.
12    Q  You said earlier that every okay charge was
13  initialed by you on these next three pages.  But you
14  didn't initial any statements before February 18th
15  of '05.  Why is that?
16    A  No — I don't know.  Maybe it's oversight.  I
17  don't know.
18    Q  Okay.  And then you're saying everything after
19  February 18th, '05, that doesn't have your initials was
20  not a charge by you.
21    A  Okay.
22    Q  Is that a correct statement?
23    A  That's correct.  Everything after the — after
24  my card was stolen and used at that ATM, none of those
25  were mine.

1    Q  But some of these that you didn't sign — that
2  you didn't initial are made — like, Winn-Dixie,
3  7-Elevens —
4    A  Well, some of the — even some of those, like I
5  said, is probably an oversight, that I didn't go through
6  every single one of them, but I was basically
7  concentrating on the — on the ATM transaction, or
8  fraudulent transactions from the ATM machines,
9  basically.
10    Q  So you don't know — you can't tell me which
11  ones of these are your charges and which ones of these
12  are the fraudulent charges, except for the fact that
13  there's deposits with empty envelopes; is that correct?
14    A  I know anything anytime after — after the — my
15  card was stolen on the 18th and I was released on the
16  19th and I reported it, any and all ATM cards used at
17  the ATM, they were not mine, because I didn't have an
18  ATM card for the machine.
19    Q  Do you have friends or family in Orlando?
20    A  No.  I don't know nobody in Orlando.
21    Q  Have you ever been to Orlando?
22    A  I drove down there — I drove through there one
23  time, and I went to Daytona one time on the beach, my
24  wife, our 16-year-old, and our dog.
25    Q  So you're saying you weren't in Orlando on the

1  22nd?
2    A  No, no.  I've only been down there -- I went
3  only one time in my life.  I'm planning to go again and
4  try to visit Disney World or something.  But no.
5    Q  Do you have any of these receipts that you say
6  are good transactions to show that you'd be in
7  Jacksonville on this date?
8    A  Can you rephrase that?
9    Q  You signed one of these on Exhibit 6 --
10    A  Right.
11    Q  — a charge at Walgreen's, you say, on the 22nd
12  in Jacksonville.
13    A  If I used the little small card, I did use that
14  a couple of times, the little small -- what's put on
15  your key chain, but the card that's in question is the
16  one that you have to use — see, even at the gas station
17  you have to use the ATM card itself.  You can't use the
18  mini one.  And so I never -- so I didn't have that ATM
19  card itself, so I couldn't — I didn't do any of those
20  transactions.  I didn't have a card.
21    Q  So even though you had asked Bank of America to
22  close your account to stop the fraudulent activity and
23  even though Mr. Corasco, or whoever you talked to at Bank
24  of America, told you that you had a negative balance, you
25  continued to use the card anyway?

1    A  No.  Contrary.  Mr. Corasco said I had a balance
2  of $500 and I says, no, how did I get $500 without
3  putting it in there, and he said, well, you do have $500
4  in your account.  So I said, well, that wasn't my
5  deposit.
6    Q  So you knew you didn't have any money in the
7  account?
8    A  Yes, I told him that that $500 was not mine.  I
9  mean, I'm double-checking it and he said that's in your
10  account so if you want to spend it, you can spend it,
11  basically.  That's what he was saying.
12    Q  He told you to spend money that you said wasn't
13  your deposit?
14    A  Basically, he said that.  I said I didn't have
15  $500.  I didn't make any deposit.  My card was stolen.
16  So, basically, he just said, well, the money is there --
17    Q  He didn't tell you —
18    A  — quote/unquote.  I'm trying to think exactly
19  how did I phrase that question to him, because -- oh, I
20  said, I don't have the big card.  That's stolen.  The
21  little one — I said, could I use that little one if I
22  have money in there even though it's not my money?  I
23  said, maybe somebody just donated something to me.  He
24  didn't care, basically.  Because I brought that up to
25  him.

1    Q Is it reasonable for you to think you can spend
2  someone else's money?
3    A Well, people donate money all the time.
4    Q To someone's bank account?
5    A Yeah, maybe somebody donated it.
6    Q Can you give me an example of someone donating
7  money to someone's personal bank account?
8    A Well, I've seen -- well, there's a lot of
9  donations going around here now around Jacksonville. I
10  don't know if they put them in the bank account, but
11  there's a lot of donations.
12    But he was aware and -- he was aware -- I made
13  it clear to him that I didn't do it because I didn't
14  have a card to do it. That's why I was reporting it.
15  So Eddie Corasco know. And as a matter of fact, I think
16  that while we was in Publix, and at that center, I think
17  I went and bought a bag of potato chips or something, I
18  believe. I think so.
19    Q So you're saying even though -- you were trying
20  to take advantage of a Bank of America, even if it was
21  deposited to you from a bank error, spending money that
22  wasn't yours?
23    A No. Well, he was the supervisor and appeared to
24  be -- in other words, of Bank of America. He was a
25  supervisor.

1    Q So you thought Bank of America gave you 500
2  bucks?
3    A I didn't say Bank of America gave me $500. I'm
4  saying that I don't know who -- I don't know who put it
5  in there, but he says you have a deposit.
6    Q Are you a 501c3? Are you a charitable
7  organization?
8    A Am I charitable -- no, but I do help people.
9  I'm not a lawyer, but I do help people fill out
10  documents and things of that nature and don't charge
11  them, and I do that right down here at the courthouse
12  here.
13    When there was an old lady needing some help
14  filling out a piece of paper to file for her IAP status
15  and she didn't know what to do, so I helped her fill out
16  the paper right there and I didn't ask for anything.
17  That was charitable, which I could charge for doing the
18  paperwork, but some people I don't charge anything. I
19  just do it out of the kindness of my heart.
20    Q You wouldn't charge people for the practice of
21  law, do you?
22    A I don't practice law.
23    Q You first contacted Early Warning System in May
24  of 2006; is that right?
25    A May 2006? I don't recall the exact date.

1    Q Okay. Exhibit 8, though, is a letter to you
2  from Primary Payment Systems dated May 9th, 2006. So
3  your correspondence to them must have been sometime
4  before that?
5    A Probably somewhere right there.
6    Q In this correspondence it says, "We're enclosing
7  information in our records that was reported to us,
8  including the name of the financial institution that
9  provided us with the report" -- I'm assuming here Bank of
10  America -- "and a list of financial institutions that
11  have accessed information reported to us."
12    Isn't that right that that is actually -- that
13  was actually the consumer report that is Exhibit 9, was
14  also included in the -- they sent you a consumer report
15  on May 9th also, is what I'm asking you.
16    A A consumer report?
17    Q This one.
18    A Okay.
19    Q They sent you that on May 9th?
20    A Actually, consumer report PPS, I'm not -- I'm
21  not sure whether this came from PPS or whether this came
22  from Compass, Compass Bank, because when I tried to open
23  the account with Compass Bank, that's when I was first
24  made aware of all these other banks and their
25  information. And then at that time -- then I walked

1  across the street from Compass Bank over to Bank of
2  America, regarding this information.
3    Q So Exhibit 8 says, "We're enclosing a copy of
4  your information in our records, including the name of
5  the financial institution that provided us with a report
6  and a list of financial institutions that have accessed
7  information in the past year."
8    Is that correct? Is that what Exhibit 8 says,
9  third paragraph?
10    A The third paragraph? Let me see the front of
11  that again, sir.
12    Q You're on the right one there.
13    A Okay. Third paragraph. Okay.
14    Q Does not Exhibit 9 state the business that
15  reported the information to Bank of America, businesses
16  that have accessed this information are AmSouth,
17  Washington Mutual, Compass Bank, and Wachovia?
18    A That's what I have right here. Because I
19  repeatedly asked them about it and, like I said,
20  Bank of America don't want to change their position.
21    Q We're fully clear of that statement. Thank you.
22    So you first contacted Early Warning in May of
23  2006, sometime before May 9th. Did you tell them at
24  that time that there was some kind of form of identity
25  theft?

1    A  I made -- I don't recall exactly everything that
2  I told them, but I knew that the information about what
3  Bank of America reported about me was not correct.  And,
4  obviously, I did tell him that my card was stolen.  I
5  think I explained everything, because Mr. Overby --
6  myself and Mr. Overby did have a conversation for maybe
7  five minutes or so.
8    Q  Who is Mr. Overby?
9    A  He works for Primary Payment.
10    Q  Do you know his position?
11    A  No.
12    Q  First name?
13    A  No.  I had some notes, but it must have got
14  lost.
15    Q  Do you know the name Keela Kratkins (phonetic)?
16    A  No.  But I have talked to several -- several
17  people from both companies.
18    Q  Do you know the name Jamie Simmons Lawrence?
19    A  I remember Jamie.
20    Q  Do you remember June McDaniel?
21    A  June?  Yeah, I have her name on the paper.  I
22  wrote attention to June.
23    Q  But you -- and then a Mr. Overby?
24    A  Yeah.
25    Q  So you've spoken to all those people about this?

1    A  Yeah, I did speak to Overby.  As a matter of
2  fact, Mr. Overby said that he would check into it and to
3  call him back in a day or two, and I did call him back
4  and he informed me that Bank of America is not going to
5  change their position.
6    Q  Isn't it right, though, that you didn't first
7  tell Early Warning about this ID theft until August 14th
8  of '06?
9    A  I don't recall that.  I think when this
10  investigation started, I was contacting everybody,
11  pretty much, or I was contacting OCC, Primary Payment,
12  Bank of America.
13    Q  So you can't remember the actual timeline of
14  events that you were working with Bank of America or
15  Primary Payment Systems?
16    A  I can't give you verbatim just on the dates that
17  I was sending letters to them back and forth and
18  contacting the OCC.  Just the dates that's on the
19  letters and all that I can relate to, basically.
20    Q  So you couldn't -- or you can't object, or you
21  can't deny, you contacted Early Warning Systems in May of
22  2006 and asked them to send you your consumer report
23  because you were concerned about false information?
24    A  Well, actually -- actually, I think who first
25  sent me that information, who I first got that letter

1  from, was from Compass about -- regarding these company
2  names, and I think when I started getting more
3  into it and making a lot of calls to Primary Payment.
4    Q  So you're saying before May 9th, you talked to
5  Compass Bank about this?
6    A  Before May 9th?
7    Q  Uh-huh.  Before --
8    A  No.  I'm not sure of that date.  I'm not sure.
9  All I know is when I tried to open up a new bank account
10  with Compass and they said I had to wait a couple of
11  days for my check to clear and I waited a few days, and
12  I went back and they told me, no, they couldn't do
13  business with me.  So I asked them why, and I think they
14  provided me a copy of this consumer report.
15    Q  Did you try to open up a bank account with
16  AmSouth?
17    A  Yes, I went to AmSouth, Washington Mutual,
18  Compass, and Wachovia.  I couldn't do no business with
19  none of them.  But I didn't know that this was the
20  information --
21    Q  Compass Bank was the straw that broke the
22  camel's back?
23    A  Yeah, basically.
24    Q  It was the fourth time that you had tried to
25  open a new account and were denied?

1    A  Yes, more or less.
2    Q  So you or Compass Bank contacts Early Warning,
3  they send you this consumer report, you call to dispute
4  it, and then you get a letter from Early Warning that
5  says we've done a reinvestigation and that the
6  information is accurate?
7    A  I did get a letter from them stating that.
8    Q  That would be May 24th?
9    A  I did get the letter from them, yes.
10    Q  Exhibit 23.  And then you called back --
11    A  Yes.
12    Q  -- to try and object to it again, but this time
13  tell them that you were a victim of ID theft?
14    A  Well, I was the victim of ID theft when I
15  contacted Washington, D.C., and Washington, D.C., told
16  me that -- because I wasn't familiar with all the
17  procedures with that.  And when I contacted
18  Washington, D.C., about it, then that's when they told
19  me to contact the credit reporting agencies and let them
20  know about identity theft.
21    Q  But you hadn't told Primary Payment Systems that
22  before?
23    A  I told Primary Payment System I believe that my
24  card was stolen.
25    Q  You told them that?

1  A  Yes.
2  Q  On day one?
3  A  Excuse me?
4  Q  On day one, first time you called them?
5  A  I don't recall the first day that I called them.
6  Q  You testified earlier that you think your card
7  was stolen after you used it at the bank to deposit the
8  $700?
9  A  Yes.
10  Q  You think your acquaintance pickpocketed you?
11  A  Well, when I went into the store, I had my
12  camouflage jacket and I had it in my pocket. Well, I
13  left my jacket on the back seat when I went into the
14  store.
15  Q  And you left your friend in the car?
16  A  Yeah. It was his car. It wasn't my car. My
17  car wasn't running.
18  Q  I apologize for going back and forth. I'm just
19  trying to -- as these things come up, I write them down
20  and they're not necessarily in the same chronological
21  order that we've gone before, so I apologize for that.
22  The police report that you submitted regarding
23  your stolen credit card or ATM card, it says that there
24  are no witnesses; is that right?
25  A  I don't know.

1  Q  That would be Exhibit 4.
2  A  Yeah, but I recall her saying that, as a matter
3  of fact. I just read it not too long ago. But I recall
4  seeing that in there.
5  Q  Well, I'd like for you to go ahead and read it
6  and confirm it.
7  A  (Witness complies.)
8  Q  So we're looking at Exhibit 4 which is the
9  Jacksonville Sheriff's Office's General Offense Incident
10  Report.
11  A  All right.
12  Q  The incident report is dated -- it says it's
13  printed 8-21-06, but is that the date you reported it to
14  the police, 8-21-06?
15  A  8-21-06?
16  Q  It's February 24th, 2005.
17  A  Okay.
18  Q  It says day, date and time it's reported,
19  Thursday, February 24th, 2005, 1430. Incident report of
20  Thursday 2-24-05. This was an incident on 2-18-05 at
21  noon, is what it says.
22  A  Uh-huh.
23  Q  If you'll look on Page 2, under additional
24  information, it looks like it's a summary of your
25  testimony here today. But then it also says there were

1  no witnesses to this incident; is that correct?
2  A  Yes, that's what it says.
3  Q  But you testified here that you knew of a guy
4  that you said stole the card and --
5  A  Yes, go ahead.
6  Q  Is that right?
7  A  I said I believe the guy -- that's the guy who I
8  believe stole the card.
9  Q  Were you not with your friend who had the check
10  at this time?
11  A  Yeah, that's the guy.
12  Q  What about the girl?
13  A  The girl, Neesie, I asked Neesie about that and
14  she said, no, she didn't see anything. She didn't see
15  him go in my pocket.
16  Q  So you told the police there was no witnesses?
17  A  There was no witnesses.
18  Q  But you told them that you thought you knew who
19  it was?
20  A  Yes. The guy -- yes, I told them I thought it
21  was the guy who was driving the car whose check it was.
22  I believe it was him because he was standing over my
23  shoulder.
24  Q  But it doesn't say that on this police report?
25  A  No, it doesn't say that on this police report.

1  Q  Do you have any kind of a revised police report,
2  anything that you told them that?
3  A  No, I don't have anything revised.
4  Q  It says under Page 2, under crime analysis,
5  "Location type: residence home. The incident occurred
6  outside this location."
7  What does that mean?
8  A  I don't know.
9  Q  Did you tell them that it occurred outside your
10  home? Did you tell them at that time that you thought it
11  was stolen at a grocery store?
12  A  I explained it to the officer just like I
13  explained it here, that -- that it was me that deposited
14  the check and I believe when I went into the store, that
15  this guy went into my pocket and took the credit card --
16  I mean, the ATM card.
17  Q  You said you had done your own investigation to
18  try and find this guy. What does that mean? What is
19  your own investigation?
20  A  Well, that's when I started doing my
21  investigation by going back down to Bank of America,
22  talking with the managers there, asking them for their
23  video surveillance cameras there at the ATM machines.
24  If they preserved that evidence, that evidence would, in
25  fact, identify the perpetrator, the one that was there

1  when I was there with the check. So that's how
2  basically I was conducting my investigation.
3      Then I was going through some papers and then I
4  found the guy's name and cell phone number. I took that
5  back to the Bank of America and I says, here's his name
6  and phone number. As a matter of fact, maybe she faxed
7  this down to risk management, Janet Hunter.
8      I advised the police of the guy's name and cell
9  phone number, and they said that, well, that they would
10 send an investigator over, a detective, to talk with you
11 and give him that information. That detective never
12 came. So I was trying to help as much as I can.
13 Q  Your Exhibit 7 -- no. Sorry. Strike that.
14     Exhibit 3, a list of properties receipt that
15 you have in your book to the JSO, Jacksonville Sheriff's
16 Office, it says you have four credit cards.
17 A  Right.
18 Q  Can you identify those four?
19 A  Those credit cards were from my credit account
20 with Bank of America. Some of them -- two of them could
21 have been the old cards that was never even used. They
22 were just there. You know when you get cards that come
23 in through the mail sometimes, credit cards to
24 activate -- they send stuff out through the mail, some
25 credit cards, but they're not activated. I got the call

1  to activate them --
2  Q  Can you tell me exactly who those four credit
3  cards were with?
4  A  Well, those four credit cards -- I think two of
5  them were from Bank of America.
6  Q  What does that mean, two of them were from Bank
7  of America?
8  A  Two credit cards.
9  Q  So you're saying you had two separate credit
10 accounts --
11 A  One had my picture on it. See, when you first
12 open it, they give you a credit card and then if you
13 want one with your picture on it, they give you that.
14 So, actually, I had two, two credit cards, but it was
15 the same account.
16 Q  You had two credit cards from the same account
17 in your wallet from Bank of America?
18 A  Right.
19 Q  Okay. What were the other two?
20 A  The other two, they could have been credit cards
21 that after I got them through the mail, that maybe I was
22 going to call so I can try to open up another account,
23 because we get them all the time through the mail,
24 credit cards. They come in an envelope with a letter
25 saying -- I think it's preapproved credit cards that

1  they send. You call to try to activate it and then they
2  do -- you give them all your information and then -- or
3  they want you to send them $35 or something to open up
4  an account, things of that nature, so those calls were
5  probably related to that.
6  Q  Do you know the banks that they were with, the
7  credit cards?
8  A  Well, I know one bank is out of New Brunswick,
9  New Jersey.
10 Q  What bank is that?
11 A  I don't know the name of the bank.
12 Q  Did you ever open up an account with that bank?
13 A  No, I never did.
14 Q  You never used that credit card?
15 A  No.
16 Q  You never activated it?
17 A  No, I never activated it.
18 Q  You just had it in your wallet?
19 A  I just had it in my wallet.
20 Q  You think, but you don't know?
21 A  I know I never activated it.
22 Q  But you think that that's one of the credit
23 cards that someone ran through the bank?
24 A  Yeah.
25 Q  Do you know for sure or are you just guessing?

1  A  I'm pretty sure that's where it was from,
2  because -- and the other one could have been -- I don't
3  know if the other one was actually mine or it could have
4  been my wife's. You know, I'm not sure about the other
5  one. It could have been mine or it could have been my
6  wife's. But the only credit card that I ever used since
7  I was here in Florida was the one from Bank of America.
8  Q  Bank of America credit card?
9  A  Yeah. Well, as a matter of fact -- as a matter
10 of fact, as I gave you an exhibit, here, where they just
11 made another offer of "call now to request up to 25,000
12 to consolidate your credit and debit card." And to
13 respond in seven days, was it? This was an exhibit I
14 gave you that I just received in the mail from Bank of
15 America. But surely I didn't try to do business with
16 them at the time because we're in litigation.
17 Q  That's fine. We don't need to discuss that
18 right now. That's not relevant. Just stick to the
19 questions we're asking now. It would be easier. You
20 submitted -- this report says you had four credit
21 cards --
22 A  Credit cards.
23 Q  -- in your wallet. You've now said that two of
24 them are from Bank of America, you think?
25 A  Yeah.

1   Q From the same account?
2   A Yeah.
3   Q One with your face on it and one not?
4   A Right. They —
5   Q And I'm sure we could ask Bank of America and
6   they would say that they actually gave you two separate
7   cards at two different times?
8   A Well, yes.
9   Q Were they both valid? They weren't expired?
10  A One could have been expired.
11  Q But you kept it in your wallet?
12  A Yes, because sometimes I have them and I don't
13  cut them up. If I showed you my wallet now, I can show
14  you a bunch of — all kinds of junk in my wallet and
15  it's just there.
16  Q Do you have any credit cards in your wallet
17  right now?
18  A No, I don't think I have no credit cards. I
19  don't have any credit accounts, but I got — but I
20  have — but I keep a lot of old cards in my pocket and I
21  don't even use them — they're just old — like, cards,
22  like debits.
23  Q Credit cards?
24  A Yeah, credit cards, I got Winn-Dixie cards, I
25  got my ID card, cards from lawyers, you know, and stuff

1   that's outdated. As a matter of fact, I even got two
2   Medicaid cards, and one is outdated. Like these
3   HealthEase cards, I have two of these and one is
4   outdated, so I just keep them in my wallet.
5   Q Can you tell me everything that's in your wallet
6   right now?
7   A No, I can't tell you everything verbatim, no.
8   Q So if I took your wallet right now, you wouldn't
9   be able to tell me what was actually in it?
10  A I know there's just some — I know my ID is in
11  it. I've got cards from lawyers and insurance cards,
12  stuff like that.
13  Q But you couldn't tell me exactly the contents of
14  your wallet?
15  A Not everything in there. Not verbatim, not
16  everything. I know there's papers, miscellaneous
17  papers, you know, stuff I had in here for maybe months
18  or maybe years, is in this wallet.
19  Q So in addition to two Bank of America cards,
20  credit cards, that you say are from the same account, you
21  have one credit card from a New Brunswick bank, but you
22  don't know what bank —
23  A No, I don't know what bank.
24  Q Never activated the account?
25  A Never activated the account.

1   Q And then there's one card that you don't even
2   remember what it was?
3   A Right. It's probably an old card that I never
4   activated.
5   Q Probably?
6   A Yeah, more than likely.
7   Q It could have been your ATM card?
8   A No, because it doesn't say ATM on the police
9   report. On the property report it says credit card, not
10  ATM card. I didn't have an ATM card. And also — and
11  then, again, when I went out and reported it that
12  Saturday to the manager of Bank of America and I was
13  under the impression that they would stop any use of
14  that ATM card.
15  Q You reported it to stop all use of that ATM card
16  after you got out of jail?
17  A Yes.
18  Q You didn't know that your card was missing until
19  after you got out of jail?
20  A After I got out of the jail, they gave me my
21  property — okay. They take everything from you. When
22  you're released, they put everything in a brown bag,
23  everything that — they just throw everything in there.
24  They check your wallet and throw it in and they check
25  everything and throw it in, and they didn't put it in a

1   bag.
2       And so when I got out, I was catching the bus
3   home and I was looking at all my papers, organizing it
4   and putting it back in my wallet and I noticed that that
5   bank ATM card wasn't there. So when I got off the
6   bus — instead of going straight home, I got off the bus
7   at Publix and I talked to Eddie Corasco where Bank of
8   America had their branch there in Publix.
9   Q Eddie Corasco is the CEO of Bank of America?
10  A No. He's the manager.
11  Q Different guy. Sorry.
12  A And that's — so when I noticed it missing, I
13  immediately got off the bus and went right there and
14  reported it.
15  Q After you got out of jail?
16  A Yes.
17  Q Did they show you what was in your wallet before
18  they took it from you?
19  A Excuse me?
20  Q Did they show you what was in your wallet before
21  they took it from you?
22  A No, no. All they do is they just look at all
23  your stuff and then they just go through everything and
24  they just making sure you got no contraband and things
25  of this nature with you and they just put it in a bag

1  .and staple the bag and put it in their property room.
2      Q   You were asked earlier about some charges
3  against you for worthless checks.
4      A   Correct.
5      Q   And those were written by you on your own
6  account?
7      A   Yeah.
8      Q   And there wasn't enough money in the account to
9  cover them; is that right?
10     A   No.  That's what they said, there wasn't enough.
11  That's why they were worthless checks, because not
12  enough to cover them.
13     Q   Because you wrote them for an amount that was
14  above what was in your Bank of America account?
15     A   I think I was buying food, I think, some snacks
16  or something.  And I think it came up to, like -- I
17  think one was $10 or $13 over the amount, and I don't
18  know what the other one was.  I think -- yeah, I think
19  it was like that, somewhere around there, very, very
20  small amount.
21     Q   Who were these checks written to?
22     A   I was at the store.  I think the way it's done
23  at the -- you can purchase something to eat at the
24  store, I think, and then -- and you can write a check
25  out to them.

1      Q   Did you know when you wrote those checks, that
2  there weren't enough funds in the account?
3      A   Not at that time, no, because I would get money
4  every month from my -- from SSI, and I would send money
5  in, you know, or I may do an odd job here and there and
6  make a little money, you know, but I wasn't sure that --
7  of the amount.  I wasn't sure because I don't keep -- I
8  don't keep accurate records.  A lot of times I don't
9  know, until they send me something that say it was
10  overdraft, and I say, well, okay, I'll try to correct
11  that and put the money back in.  And Bank of America
12  would give you -- sometimes put money back in and make
13  deposits.
14     Q   So you were perpetually being charged overdraft
15  fees?
16     A   Yes, basically.  Some were overdraft.
17     Q   Your account was in the negative a lot?
18     A   Yeah, and that's because the bills that I'd pay.
19  I would deposit it and I would pay my bills and a lot of
20  times I don't keep an accurate record.
21     Q   Did you pay any bills with the $500 that Bank of
22  America said was in your account that wasn't yours?
23     A   Well, I didn't use all that $500.  Maybe a
24  couple of dollars of that $500, I probably used a very,
25  very small amount of it, a very small amount.

1      Q   One final thing here, we talked about -- I asked
2  you earlier about the May letter that you got -- May 24th
3  letter saying that the reinvestigation was complete.  And
4  then you sent in a rebuttal letter.
5      A   Right.
6      Q   I'm trying to find that here.  Exhibit 13 is the
7  rebuttal letter from June 1st.
8      A   Okay.  Are you talking about the one that I
9  wrote?
10     Q   Yeah.  I'm not going to ask you about that one.
11  On June the 1st, you sent a rebuttal letter to Jamie at
12  Primary Payments.
13         And then on August 29th, you, again, received a
14  letter from PPS -- that's Exhibit 16 -- that the
15  reinvestigation had occurred and that the file was
16  accurate.  You received that both from Bank of America
17  and Primary Payment System, again, in August of '06.
18     A   Yes, I received those letters from them.
19     Q   So twice you notified them?
20     A   That the information is, in fact, incorrect.
21     Q   And twice they came back and told you that it
22  was?
23     A   Yes, they did, and I opposed it again.  And I
24  think the last letter that I got from -- or sometime I
25  got a letter from OCC.  It says that if I'm not

1  satisfied with what they did as far as their findings to
2  my allegations, that I can take court action.  And so I
3  figured that would be the best route was now is -- was,
4  in fact, to take court action to get to the truth of the
5  matter.  In this way maybe I can be assured that the
6  truth is brought out before the court.
7      Q   So you -- one of your -- you said earlier that
8  you thought that you didn't know that the -- you didn't
9  know the reinvestigation didn't occur?  You just thought
10  it didn't occur reasonably?
11     A   Well, based upon -- well, after I think about it
12  and based upon the facts, I'm saying that I can't see
13  how they can have a reinvestigation and again come up
14  with the relevant facts of the truth of the matter.
15     Q   What is it that you want Early Systems to do
16  more to investigate?
17     A   Basically, I wanted them to reinvestigate the
18  facts of it regarding that -- like, the ATM had video
19  surveillance cameras.  Those cameras can identify that
20  person standing behind me, number one.
21     Q   Okay.  Let's stop right there.  It can identify
22  the person behind you?
23     A   Right, the guy looking over my shoulder.
24     Q   Who you know?
25     A   I don't actually know him.

1   Q  But you knew his name?
2   A  I had his first name and his cell phone. That's
3   all.
4   Q  So you want Early Warning to identify someone
5   that you don't even remember?
6   A  Well, I wanted Early Warning to do a complete
7   and accurate investigation and help me get the
8   information that we need to get this perpetrator and
9   prosecute him. And I believe that Bank of America do
10  have -- that their video surveillance cameras is there
11  at the ATM machines. There was a lot of information I
12  gave to the bank, the facts through risk management.
13  None of this stuff is coming up -- is coming to me.
14  Q  How do you know that none of this is coming up?
15  A  Because I already have interrogatories from Bank
16  of America, answers saying that they don't have video
17  surveillance tapes. And that's why I called them and I
18  said, wow, as far as I know, bank ATM machines do have
19  cameras.
20  Q  I'm not asking you what Bank of America did.
21  I'm asking you what -- what you asked Early Warning to do
22  that would be more reasonable than what they already did.
23  A  I want Early Warning Systems to remove this
24  false information. This information has ruined my life
25  so far. I can't even open up accounts. For the last

1   three or four years, I'm going through all kinds of
2   hardships. And, you know, it's just ridiculous because
3   the allegations is not true.
4   Q  Let me rephrase my question or attempt to ask it
5   again: You've alleged that you don't think that
6   Early Warnings did anything -- did a reasonable
7   investigation?
8   A  They didn't do a reasonable investigation.
9   Q  What is it you want them to investigate that
10  they didn't before?
11  A  Reinvestigate the information that's about me
12  and come up with the truth.
13  Q  Is Primary Payment Systems a law enforcement
14  agency?
15  A  Not that I know of.
16  Q  Isn't Primary Payment Systems --
17  A  Primary Payment's and Early Warning Systems'
18  responsibility is before they publish any information
19  about any citizen, they should assure that the
20  information is true, and they failed to do that.
21  Q  Where does it require them to assure it's true
22  before they publish it?
23  A  I'm not here to try to teach you law. I mean,
24  like, you should know. You're a very smart man. You're
25  an intelligent man. You're a lawyer, so you know better

1   than I do.
2   Q  I can't disagree with that.
3   A  Okay. Thank you.
4   Q  You stated -- you attempted to state a claim
5   that says Early Warning Systems did not follow reasonable
6   procedures.
7   A  Correct.
8   Q  But what you're telling me now is you don't
9   think they followed reasonable procedures because they
10  didn't find what you say is the truth?
11  A  Well --
12  Q  How is that Early Warning System's
13  responsibility to find the truth as you see it?
14  A  No. It's not how I see it, but they failed to
15  investigate all the accuracy of the information. I
16  believe that if they would have a more thorough -- if
17  they would have done a thorough investigation based upon
18  the evidence from the police, based upon, you know, all
19  the facts that will go before them, then they wouldn't
20  have published that information.
21  Q  Did you not send them all these facts that you
22  say that they should have reviewed?
23  A  I sent most of the documents to Bank of America,
24  all that I had, at the time or around the time when it
25  first happened, because I was really, really helping

1   them trying to locate the perpetrator.
2   Q  So you're saying that you sent them all the
3   documents that you think should be reviewed to
4   Early Warning Systems?
5   A  I sent them to Bank of America. I did send some
6   things to Early Warning. I don't recall everything that
7   I did send to them, but most of -- just all the
8   paperwork went to Bank of America, 3535 University
9   Boulevard, through fax. But the only thing
10  Early Warning tells me is that they're going by what
11  Bank of America said, basically.
12  Q  It's a yes or no question. If Early Warning
13  Systems reviewed everything you said that they should
14  have reviewed and that you sent them and came to the
15  determination that the information on your credit report
16  was accurate, do you think that's unreasonable because
17  it's not accurate?
18  A  It's not accurate. I want to know what do they
19  base it on. They're only telling me they're only going
20  by what Bank of America said. That's what they're going
21  by, basically. Because when I talked to Mr. Overby, he
22  said, well, let me talk with Bank of America and I'll
23  see what Bank of America wants to do, basically. So
24  when I talked to him again, he said Bank of America is
25  not changing their position, basically. So I said,

1　okay, then I'm going to have to proceed with other
2　actions.
3　　Q And you have no idea what kind of investigation
4　Early Warnings did, do you?
5　　A Well, they didn't put it in detail. The only
6　investigation they -- that I knew that they did was
7　contact Bank of America.
8　　Q Is it a minimum standard for you to do a
9　reasonable investigation for them to find the guilty
10　party?
11　　A I can't answer that question.
12　　Q Well, you're saying in your complaint that
13　Early Warning Systems did not perform a reasonable
14　investigation. What is reasonable to you?
15　　A Reasonable is, I guess, collecting all the
16　information from all the parties and sending their
17　investigators out to assure that the information about
18　the person is true before they publish it.
19　　Q Does that include the police report?
20　　A Yes. That includes everything.
21　　Q Does that include the documents that you were
22　provided today?
23　　A The police report documents that I presented
24　through discovery and disclosures that I made, video
25　surveillance tapes, pictures, taped conversations. I

1　don't see anything to whereas they say anything about
2　the video surveillance tapes.
3　　Q Well, the video surveillance camera doesn't
4　exist as testified by Bank of America.
5　　A Well, then, that must be the first bank that I
6　know of that don't have video surveillance cameras where
7　people are making deposits and withdrawals at ATM
8　machines.
9　　Q And that includes your -- you've taken a look at
10　the discovery that Early Warning sent you, the documents
11　that they have?
12　　A I sure did.
13　　Q And what is not included in there that you think
14　should have been reviewed?
15　　A What I think should have been reviewed, the
16　facts that there's evidence that's -- that haven't came
17　up yet from Bank of America, and I think that they
18　should have really pushed Bank of America hard to get
19　this information. I hope they consider the police
20　report. I hope they consider my statements. And just,
21　basically -- you know, just basically exactly what
22　happened.
23　　I mean, like if a guy says, well, if I say this
24　guy has done this and this guy says, no, I was in jail
25　at this particular time when this started, then guess

1　what, he couldn't have been there, if he's in jail
2　confined. Now, if that's the case, I have to bring the
3　whole Sheriff's department and bring in the booking --
4　the arresting officers, the booking officers, the
5　officers who locked me in at 8:30 at night, and let them
6　testify the man was in the cell at 2 a.m.
7　　Q We could do that.
8　　A Yeah.
9　　Q But that would only negate one of the deposits,
10　one.
11　　A All the other deposits -- okay. You're right.
12　All the other deposits -- and there we go back to the
13　silent witness, which is the video surveillance camera,
14　that I was never at that place at the time using the ATM
15　card, and that's incumbent upon the bank to prove that I
16　was. And Bank of America cannot prove that because I
17　was never there, nor can they provide any eyewitnesses
18　that can put me there or any kind of pictures or
19　anything, because I was never there.
20　　Q So you're saying that you're the Plaintiff in
21　this case but Bank of America has to prove you wrong?
22　　A Bank of America -- under the 1st Amendment, Bank
23　of America has to come forward with the truth of the
24　matter and prove that I was there. I was never there.
25　And they can't prove I was there, because I never did

1　it. Simple.
2　　Q Can you prove that you weren't there?
3　　A Can I prove that I wasn't there? Yes. The one
4　affidavit, I wasn't there. They have to prove that I
5　was there. The bank has cameras and/or these other
6　locations where -- where this guy used his card at, half
7　the places I don't even know. I'm new in Florida,
8　basically. I don't know all these places in Florida.
9　I'm from New Jersey and Virginia. I grew up in
10　New Jersey. I lived in Virginia, and I just came to
11　Florida back in August. So, basically, I wasn't even in
12　Florida a year when this arised.
13　　Q And you've never been to Orlando?
14　　A I've been to Orlando one time, down by the beach
15　side. I took my wife and her son and our dog. We went
16　down to Daytona down to the beach and we went to
17　Orlando. As a matter of fact, I took a bus down into --
18　going to the airport one time, to be exact. And I catch
19　the bus, the Greyhound. And from the Greyhound -- I
20　left from the Greyhound and we went to the airport.
21　　Q When was that?
22　　A That was -- that was last -- what, year before
23　last. I had to fly overseas. I went overseas.
24　　Q So the year before last, that would be 2006?
25　　A 2006, 2000 -- yeah, I think it was 2006, when I

1  .think my wife's — her aunt died. It wasn't last year.
2  It was the year before. Around 2006, I think it was.
3  It was in the summertime.
4      Q  Was that February 2006?
5      A  No. It was in the summer. It was in the
6  summer, because as a matter of fact, I think I was in
7  the homeless shelter for a while downtown.
8      Q  Can you provide us with a copy of your plane
9  ticket to show when you were in Orlando?
10     A  If I can find it. I'll have to check my
11 suitcases, but I'll check my suitcases -- I'll check my
12 suitcases, because I did go through -- the Greyhound
13 took us down to Orlando and from there, they took us --
14 I think we went to the hotel and then from the hotel,
15 we, like, flew out. We flew down to Miami. From Miami,
16 we flew to St. Lucia.
17     Q  So other than the time that you took your wife
18 and her son to Orlando —
19     A  Right. I went down in the Greyhound.
20     Q  — when was the first time you went down there?
21     A  I'm saying I think that was the time around the
22 time I went down there, because I went — we went to
23 Daytona. We went to Orlando around the beach area. We
24 were just driving around, finding the beach. We was
25 trying to see how far we could go.

1      And then the only other time I would have been
2  down to Orlando was by Greyhound, and from the Greyhound
3  bus, I went to the hotel.
4      Q  So when was the time that you went to the beach?
5      A  The beach, it was around the summer.
6      Q  Of?
7      A  I think it was 2006, I think.
8      Q  And it was also the summer of '06 that you went
9  to Orlando by Greyhound?
10     A  Yeah, by -- me and my wife went overseas. They
11 had buried her aunt's husband.
12     Q  What do you mean by summer, what months?
13     A  When it was hot. Like now, maybe around now,
14 but I think we went around, was it August, I think it
15 was. I think it was around August. No, no, wait a
16 minute. July -- it was between June and August.
17     Q  Is because it's hot in May.
18     A  Right.
19     Q  It's hot in April.
20     A  But it was between June and August. It was
21 between June and August. Yeah, because I was in — I
22 think I was in Sulzbacher Shelter at the time and she
23 came in and she notified them, like, she needed me to go
24 overseas with her for a funeral, and they allowed me to
25 go.

1      Q  Okay.
2      A  Because I was over in that shelter for a while.
3      Q  So other than those two times you've been to
4  Orlando, you can't remember any other time?
5      A  I've never been to Orlando no other time.
6          MR. TRAUB: Okay. That's all I have.
7          MR. PARRINO: I got follow-up with you a little
8  bit, Mr. Allmond.
9              REDIRECT EXAMINATION
10 BY MR. PARRINO:
11     Q  Now, Bank of America began its investigation in
12 May of 2006, correct? Around May of 2006, correct,
13 that's when you asked them to investigate?
14     A  No. I thought this happened as soon after – I
15 think it should have started around in February, I would
16 think, or March, I would think, at the –
17     Q  There's two different things here: There's the
18 report of theft of your card to Eddie Corasco. That's
19 the first thing, correct?
20     A  Right.
21     Q  And the second thing is in May of 2006 when
22 Bank of America was asked to investigate the information
23 that they provided to Primary Payment Systems, correct?
24     A  There was a request at that time, but I think in
25 between that time, I was in and out of the bank talking

1  with the managers and all and trying to get information
2  and give them information of the facts down in risk
3  management to prove my innocence.
4      Q  And that was from May 2006 until February 2007
5  that you were in contact with various people at the bank,
6  be it anyone from Janet Hunter to — on upwards?
7      A  I think it -- basically, after I reported it to
8  Eddie Corasco and I went over to the main branch across
9  the street, right there on University Boulevard, and I
10 was trying to get them at that time to start preserving
11 the evidence and all and I was – so I guess just in
12 between that time span of February and, I guess, up
13 until now, because it's still ongoing.
14     Q  Okay. Well, let's – and at the time you asked
15 them to -- you claim that you asked for the preservation
16 of the surveillance video. Which surveillance video are
17 we talking about?
18     A  From the ATM machines.
19     Q  Which ATM machines?
20     A  The ATM machines, the one 3535 University
21 Boulevard, I asked for that because that would identify
22 the guy that was standing behind me and the guy that
23 probably while he was looking over my shoulder getting
24 my number. So that's why I wanted them to, like,
25 preserve that particular tape.

1    Q Did you ever ask them to preserve the other
2 surveillance tapes?
3    A Well, actually, that was the only Bank of
4 America that I've been in where they allege unauthorized
5 transactions took place. The other places, I just
6 recently, maybe about a month or so ago, just when I was
7 going through the paperwork, that's when -- that's when
8 I noticed that this guy had been to all these other
9 places. I says, wow, I've never been in those places.
10    Q And a month or so ago, meaning a month or so
11 from today?
12    A Yeah, yeah. I was basically looking at that.
13    Q Now, if -- let's see. Now, hold on. Are you an
14 expert -- are you holding yourself out as an expert in
15 security practices that banks have?
16    A No, I'm not. Just no more than what I would
17 ask of any other paralegal that's trained to do, you
18 know, basic stuff that paralegals learn either in
19 school, paralegal schools, paralegal correspondence
20 studies, and things of that nature, just trying to get
21 all the evidence together to proceed, just --
22    Q Do you know how long that banks retain, like, a
23 day's worth of security footage? Do you have any
24 knowledge of that?
25    A No, I don't.

1    Q Do you know the date when you requested that
2 surveillance video footage from them?
3    A I think it was -- not the exact date, but it was
4 around the time that I made a report to the police. It
5 was around that time, because at that time, now, I
6 really started to get more into the investigation.
7    Q So around February 24th?
8    A Around -- probably so, probably around that
9 time. Soon after that, because I was talking with the
10 lady -- her responsibility was to remove envelopes from
11 the ATM machine.
12    Q Yes. We have that testimony already.
13    A Okay. Right, right. So I told her that we can
14 catch this guy, that I need you to preserve all the
15 video surveillance tapes because we're going to need
16 them.
17    Q And would you be surprised if she couldn't do
18 that because your notification was too late, because the
19 bank -- the bank's practice was to keep video footage for
20 a shorter period of time? Would you be surprised if that
21 were the case?
22    A Well, not if she would have gave it -- requested
23 it from their security to --
24    Q I don't think you're following my question. I'm
25 saying, you don't know how -- we already established that

1 you do not know how long a security department maintains
2 that footage.
3    A No. No, I don't. It could be 60 days. It
4 could be a year. It could be three days.
5    Q You're right. And if it were only three days,
6 your request would have been made too late; is that not
7 correct?
8    A Well, like, the way that I look at it, I don't
9 know, but I look at, when I hear things --
10    Q It's a yes or no question.
11    A -- on the news, where they get information tapes
12 when people commit crimes in the areas and things of
13 this nature, the police go in and the police grab those
14 video surveillance tapes and things of that nature, so
15 that was going on in my mind, you know, the way the
16 police was going in and saying I want this and I want
17 that. So I figure, like, okay, they should at least
18 preserve them, or they can find that information.
19    When people go in and they rob banks and stuff,
20 the FBI, they get the information, you know, police,
21 they get that information. So, therefore, I had reason
22 to believe that that was ample enough time for them to
23 go in there and preserve those tapes.
24    Q You may have thought that, but would you be
25 surprised if the bank had a different policy?

1    A Well, the bank may have had a different policy,
2 but I didn't know if they had a different policy. She
3 never stated that, no, I can't get it or -- or if not,
4 it's too late, we only keep the tapes running for maybe
5 two days or three days. She never stated that.
6    Q Now, with regards to the actual investigation
7 done by the bank of the information in the Early Warning
8 Systems -- we're keeping this separate from the previous
9 report. We're talking about when you went to
10 Early Warning Systems and then the bank started
11 investigating, that the bank started to reinvestigate the
12 information they provided in May of 2006, correct, in the
13 letters -- we've established that, through the letter?
14    A Yes. He did send some letters out, just what
15 they stated that he did.
16    Q And in February 2007, the bank concluded their
17 investigations?
18    A Allegedly, but -- you know, but it's so hard for
19 me to really believe a lot of things the bank says when
20 the bank is deliberately withholding relevant
21 information.
22    Q What is the bank deliberately withholding from
23 you, sir?
24    A Like, if you notice, when I -- the OCC had
25 problems getting information from the bank, and I think

1  .we had made that clear in one of the documents, letters,
2  basically, whereas I demanded that Bank of America
3  release records to OCC. And I think that was because
4  they couldn't get the information from Bank of America,
5  if you'll look at one of my letters that I wrote.
6      Q  Let's see if I can find that in here. That
7  would be Exhibit 20 is the one you're referring to as the
8  OCC letter we have. And, in fact, that letter -- looking
9  at letter 20, that letter actually requests that you
10  provide the bank with information, that you provide a
11  copy of your booking receipt; is that not correct?
12     A  That information is based upon when Bank of
13  America said that they sent me a letter regarding this
14  and I said that they never did. However, I will get
15  it -- I will get that information and submit it, because
16  I never received that letter from Bank of America, but
17  that's --
18     Q  All right. You submitted that to the bank well
19  after the bank had informed you that their -- well after
20  the investigation had closed?
21     A  No. That was because I never received the
22  letter requesting the booking report from Bank of
23  America and when -- then when OCC told me that it was
24  closed, I said why, and then -- and that's when they
25  made me aware that Bank of America said that they

1  contacted me or sent me a letter requesting this
2  information. I said contrary, I did not receive
3  anything from Bank of America. In fact, if Bank of
4  America wanted this information -- in fact, if this
5  information is needed, then I will go down to the police
6  department and get it, in which I went down to the jail
7  and I got the information, because I never received it.
8      Q  But you also testified that you were having
9  problems with your mail, that sometimes letters were
10  missing and that doesn't mean that the bank did not --
11  that someone didn't just send you something because --
12     A  No. It doesn't mean that, but I did get an
13  envelope with one sheet of blank paper in it, to be
14  exact.
15     Q  And you didn't contact anyone to find out why
16  there was a blank sheet of paper in there?
17     A  Yes, I did. Yes, I did. In fact, I contacted
18  OCC because I was trying to trace them and ask them
19  why -- why would they send me a letter with a blank
20  piece of paper -- I mean, an envelope with a blank piece
21  of paper. It might be some oversight which document is
22  supposed to be contained in that envelope.
23     Q  And you never contacted Bank of America to
24  figure that out?
25     A  Yes, I did. OCC says, no, it wasn't them, call

1  the president's office, the office of the president, and
2  that's how I got their name and their phone number of
3  the president's office, through OCC. And I called them
4  about it.
5      Q  And when was that?
6      A  That was in that same time span. And that's how
7  I wind up talking with -- what's the name, Rene or -- do
8  you know? That's how I started conversing with her,
9  because now I had a person -- another person in the
10  office that I could talk with and try to get this
11  resolved.
12     Q  And that was after receiving the blank letter?
13     A  The blank thing, yes, that was after that. And
14  then, like I said -- and then I went down and I got the
15  information that they needed, the information that I
16  couldn't get that they needed, and I submitted it to
17  them.
18     Q  What do you conclude was unreasonable about Bank
19  of America's investigation?
20     A  What do I conclude?
21     Q  Yeah. What do you believe was unreasonable
22  about Bank of America's investigation?
23     A  What I think was unreasonable about Bank of
24  America's information is that -- number one, is that
25  they tried to hold me liable for something that I didn't

1  do. I wasn't in any of the places at that day and time.
2      Q  Hold on, sir. That's the conclusion; okay? I'm
3  talking about the process. I want to know what you
4  consider -- the conclusion is one thing. We all have
5  different conclusions here. The issue I want to know is
6  what's the process?
7      A  The process, I think, Eddie -- starting with
8  Eddie Corasco, he should have -- once I informed him
9  that I didn't have the card, then he could have stopped
10  any transactions to the ATM.
11     Q  Hold on -- hold on again. We're talking
12  about -- we're talking about the investigative process,
13  not anything that happened when you first reported your
14  card stolen.
15     We're talking about from May 2006 until
16  February of 2007, when you were contacting people at the
17  Bank of America daily and when you were providing
18  documents that they were requesting, we're talking about
19  that specific thing. What specifically during that
20  process of collecting documents from you and
21  investigating for the purposes of confirming the
22  information they provided to Primary Payment Systems --
23  that's what we're talking about here -- what went wrong
24  in that process, in your opinion?
25     A  Because the information that they was processing

39 (Pages 150 to 153)

1 .was not correct. The information Bank of America was
2 trying to process to Primary Payments was not correct.
3 And Bank of America, I think that they should have
4 reviewed the video surveillance tapes, if they had them.
5 Further, the more extensive search into this perpetrator
6 to try to find him. I was working along with them
7 100 percent. I wanted to try to identify this guy
8 through the pictures, if Bank of America would have
9 provided that.
10 Other documents and papers, like any kind of
11 taped conversations that was made between me and the
12 bank, I think Bank of America should have had possession
13 of that, because -- when you do call the bank and you
14 do -- I think there's a recording come on that says this
15 information may be taped or something to that effect.
16 And there's just a bunch of procedures that I think
17 that, you know -- that they should have followed and
18 they didn't follow.
19 Q How do you know that they didn't follow those?
20 A Because if they would have followed them, they
21 would have reviewed that information about me.
22 Q Isn't that kind of circular logic?
23 A It's just common sense.
24 Q Now, do you understand that as a plaintiff in
25 this case, it's your burden to establish that the

1 investigative procedures were not reasonable; do you
2 understand that?
3 A As a plaintiff, the only thing I have to prove
4 is that I never did any of that, what they said that I
5 did, as far as abusing the ATM machine and putting blank
6 envelopes in it and taking money out in some kind of a
7 way, which I don't even know anything about that.
8 That's a new one to me.
9 And all these places these guys was at, I mean,
10 like, if Bank of America wanted to, they can take me and
11 I'd be more than happy to go to any of these banks where
12 this guy abused the ATM, for identification purposes,
13 and won't nobody identify me because I was never there.
14 Q Do you understand that as a plaintiff in a
15 lawsuit you have the burden of proving any allegations
16 you make; do you understand that?
17 A Well, the allegations against me, I think the
18 burden shifts through Bank of America to prove that I
19 didn't abuse an ATM machine. I can establish that I
20 never was at those places at the day and time by way of
21 affidavit, and Bank of America would have to prove that
22 I was. And I will be demanding again the silent
23 witness, which would be those video surveillance cameras
24 at those ATM machines. That would say a thousand words.
25 Q You just testified you were in a homeless

1 shelter at one point?
2 A Yes, I was. I was at Sulzbacher.
3 Q Why were you there?
4 A I was at a homeless shelter because myself and
5 my wife's son don't get along, so to avoid a lot of
6 problems, I said I'll go into a shelter for a while.
7 Q I'm going to ask you another question: Have you
8 ever been -- this is a question I often ask witnesses
9 also: Have you ever been institutionalized or been
10 evaluated for mental health problems?
11 A What you mean? Through my accidents and all?
12 Q No. Have they ever -- have you ever needed to
13 see a psychiatrist?
14 A I have talked to psychiatrists a long time ago.
15 More than 10 years ago, I believe.
16 Q Have you ever been diagnosed with any kind of
17 mental illness?
18 A Just the fact that when I had surgery in my neck
19 and they removed some ligaments and stuff like that,
20 then I had to see a psychiatrist or psychologist because
21 of the ligaments or whatever they took out of my neck.
22 Q So you've never been diagnosed with
23 schizophrenia or any kind of --
24 A No, I'm not schizophrenic, no.
25 Q -- or any kind of manic depressive or --

1 A I used to be depressed a long time ago.
2 Depression is just depression, but never schizophrenic
3 or nothing like that.
4 Q So you consider yourself a mentally stable
5 person?
6 A I'm not a doctor, but I think I'm okay.
7 MR. PARRINO: All right. That's all I have.
8 MR. TRAUB: If I can just -- and this should be
9 it, two questions.
10 RECROSS EXAMINATION
11 BY MR. TRAUB:
12 Q When did you find out that Bank of America
13 didn't have surveillance videos that you were asking for?
14 A Well, actually, just recently, because I've been
15 propounding -- or I've requested through discovery that
16 they produce the video surveillance tapes and/or any
17 other recorded conversations, and in their responses
18 from Bank of America's interrogatories, they said they
19 don't have any video surveillance tapes, or taped
20 conversations.
21 Q So you've never -- before you filed this
22 lawsuit, you didn't know that these tapes didn't exist?
23 No one ever told you that?
24 A No, no, because I went there and I requested
25 that they preserve them, so I didn't know. But it was

1   my impression and when I had asked them do you have
2   video surveillance cameras at the ATM machines, and they
3   stated yes. And I said, well, they should have the
4   pictures.
5   Q   I just want to ask you a couple quick questions
6   about damages that you're asking for in this litigation.
7   I don't have it in front of me, but it was a significant
8   amount of number.
9   A   Yes.
10  Q   Where did those damages come from?
11  A   Well, those damages came from basically me
12  suffering, not being able to do business. You know, I'm
13  a paralegal now and when people pull up information
14  about me, you know, this will pop up, oh, this guy
15  committing fraud on an ATM machine, this and that and
16  the other, you know, and that really makes me look --
17  look real, real bad. You know, sometimes --
18  Q   Stop there for a second then. You're saying it
19  hurts you in your job because you're a paralegal, but
20  didn't you testify earlier today that you never actually
21  sought a job as a paralegal?
22  A   Well, not in a company, but on my own, I do my
23  own, like -- I'm, like, freelance, but I'm not working
24  with a company, no. But as I freelance -- or I have a
25  business card and if somebody may need a paralegal, I'll

1   say, well, here's my card and if they want to check me
2   out, then that's going to come up. Okay. But I do not
3   work for another company. I just do my own little thing
4   every now and again, so I don't work with a company or
5   nothing.
6   Q   Have you ever given your business card to a
7   person?
8   A   Yeah.
9   Q   And did they come back and tell you they don't
10  want to hire you because you have a bad record?
11  A   Well, a lot of people, some of them don't even
12  call me back at all, so I'm wondering why. I sit down
13  and I talk with them and they don't even call me back at
14  all sometimes.
15  Q   Who are these people you've talked to that don't
16  call you back?
17  A   I don't have their names. I mean, I'll be at
18  the courthouse, because I'm always around the
19  courthouses, the one downtown here and the one on Bay
20  Street all the time. If not, I'm over by the federal
21  courthouse a lot, and, you know, I meet people, I talk
22  with people and even -- you know, and so I'll say, well,
23  here's my card, you know, you can give me a call. I can
24  maybe do some paperwork or something like that. You
25  know, I can't give you legal advice. I'm not authorized

1   to by law, you know, but I could prepare documents and
2   things of that nature for you.
3   And so these people -- as a matter of fact, I
4   think there was one lady that worked in the courthouse
5   and she works on the mezzanine floor at the Duval County
6   Courthouse. She works in the felony department. She
7   wanted me to do some information -- she wanted me to do
8   some legal work, prepare some documents for her, or
9   maybe for her daughter. And I gave her my business
10  card, and, like, she said, well, let her -- I guess she
11  was going to check me out, you know, about that. And
12  then after that, I never heard anything else from her.
13  So I said, oh, she probably ran my information about
14  this, about what the bank published about me and they
15  don't want to touch me.
16  So, you know, besides that, I go for -- I have
17  applied for some car loans and stuff. Unfortunately, I
18  have a very, very hard time with that. They run my
19  credit. You know, even in some housing departments they
20  run my credit, you know, and the information come up.
21  You know, I'm not getting anywhere, you know, so --
22  Q   Do you know that this information comes up when
23  they run your credit, or do they just come up with a
24  number?
25  A   Sometimes -- actually, it probably does come up.

1   Q   Probably does?
2   A   The reason why I say that is because Compass
3   Bank, when I went to them to try to open that account,
4   that information came up.
5   Q   Well, actually, I thought we had a letter from
6   Compass Bank that says no -- they don't know why you were
7   denied. They said you needed to contact Early Warning.
8   A   No. They denied me and they wanted me to go
9   over to Bank of America and have that information --
10  about that information. I went to Bank of America
11  across the street about that, to try to get them to
12  remove it, but they wasn't going to do it. I contacted
13  Primary Payment to get more of the information. I think
14  they have a copy -- because more than likely, they have
15  that copy in their file, or maybe your company -- your
16  client faxed it to them, or something to them or
17  something, but then, again, it's public information,
18  basically.
19  Q   Did you try and get a car loan or a house loan
20  before all this happened?
21  A   In Florida, no, because I had my own card when I
22  came to Florida. My card got stolen. I think it got
23  stolen.
24  Q   Do you have any copies of your credit report
25  before this incident with Bank of America?

1    A  No, I didn't.

2        MR. TRAUB:  Okay.  That's all I have.

3        MR. PARRINO:  I have one or two follow-ups.

4        FURTHER REDIRECT EXAMINATION

5    BY MR. PARRINO:

6    Q  We're talking about your credit history here.

7  Did you have good credit before all this happened?

8    A  No.  I don't think I had the best credit.  I

9  don't know what's considered as good credit.

10    Q  Did you have a lot of problems maintaining a

11  positive balance in your bank account before this

12  happened?  We reviewed your statements, correct?  We

13  reviewed your earlier statements?

14    A  Yeah.

15    Q  Your bank often was in the negative; is that

16  correct?

17    A  Yes.

18    Q  Did you pay all your bills on time?

19    A  No.

20    Q  Did you — when you got credit card offers, did

21  they always require that you have a secured credit card,

22  and by that I mean, that you pay, like, $35 to activate

23  the credit card?

24    A  Well, they would — I don't recall.

25    Q  Now, you also testified that there were large

1  periods of time where you didn't have bank accounts.

2    A  Right.

3    Q  That living in Virginia, at the time you lived

4  in Virginia you did not maintain a bank account; is that

5  correct?

6    A  No, I didn't have a bank account, that I recall.

7    Q  Did you have any credit cards when you lived in

8  Virginia?

9    A  I could have gotten them through the mail

10  because I had them in my wallet but I never activated

11  them.

12    Q  So you have no idea what your credit was before

13  you —

14    A  No, no, I didn't.

15        MR. PARRINO:  Okay.  Nothing further.

16        MR. TRAUB:  Me either.  I think we're done

17  here, sir.

18        You have a right to read.  Do you want to tell

19  him the right to read, or that he can waive reading the

20  transcript?

21        MR. PARRINO:  I'll tell you.  You have the

22  right to read or waive the transcript of this deposition

23  to make sure that the — to verify the accuracy of the

24  reporting.

25        You can't change what you testified to, but you

1  can — you can verify the accuracy of what's in there,

2  or you can waive that right.  If you choose to read, you

3  will need to come here to the court reporter's office to

4  read over the transcript should it be ordered and then

5  sign that you verified the accuracy of those statements.

6  You'll be contacted, told to come here, and you'll be

7  given a certain amount of time — I believe it's 10 days

8  or something to respond to that letter and come here —

9  or you can waive that right to read.

10        THE WITNESS:  I can — I don't mind reviewing

11  it.  They can send me a letter.  I'm close by, and they

12  can send me a letter, so I can review it.

13        MR. PARRINO:  We'll order the transcript.  Do

14  you want to take a copy?

15        MR. TRAUB:  We'll take a copy.

16        (Whereupon the deposition was concluded at

17  1:25 p.m.)

18        - - -

1        CERTIFICATE OF OATH

2

3  STATE OF FLORIDA)

4  COUNTY OF DUVAL )

5

6        I, the undersigned authority, certify that

7  on May 19, 2008, DARRYL ALLMOND personally appeared

8  before me and was duly sworn.

9

10        WITNESS my hand and official seal this 2nd

11  day of June 2008.

12

13

14

15

16        Gina Oertli, RMR
          Notary Public - State of Florida
          My Commission DD450078

17        My Commission expires 8/19/2009

18

19

20

21

22

23

24

25

CERTIFICATE OF DEPOSITION TRANSCRIPT

THE STATE OF FLORIDA )
COUNTY OF DUVAL    )

I, Gina Oertli, Registered Merit Reporter and Notary Public in and for the State of Florida at Large, do hereby certify that the aforementioned witness was by me first duly sworn to testify the whole truth; that I was authorized to and did report said deposition in stenotype; and that the foregoing pages numbered 1 through 164, inclusive, are a true and correct transcription of my shorthand notes of said deposition.

I further certify that said deposition was taken at the time and place hereinabove set forth and that the taking of said deposition was commenced and completed as hereinabove set out.

I further certify that I am not a relative, employee, attorney, or counsel connected with the action, nor am I financially interested in the action.

The foregoing certification of this transcript does not apply to any reproduction of the same by any means unless under the direct control and/or direction of the certifying reporter.

IN WITNESS WHEREOF, I have hereunto set my hand this 2nd day of June 2008.

Gina Oertli, RMR
Notary Public - State of Florida

ESQUIRE DEPOSITION SERVICES
200 West Forsyth Street, Suite 450
Jacksonville, FL 32202
866.211.3376

June 2, 2008

MR. DARRYL ALLMOND, Pro Se
3830 University Blvd. South,
Apartment 31
Jacksonville, Florida 32216
RE: Allmond vs. Bank of America, et al
Please take notice that on the 19th day of May 2008, your deposition was taken in the above-referenced matter. At that time, you did not waive signature

The transcript is available at our offices for your review. Please contact us for an appointment.
Any corrections you wish to make to the transcript should be made on the errata sheet at Page 167. Please do not write on the transcript itself.
Please complete review of your transcript within 30 days and return errata sheet to our offices. You need not return the entire transcript.
If you now wish to waive your right to read and sign the transcript, please indicate so on the errata sheet and return it to our office.
Sincerely,

Gina Oertli
Court Reporter - Independent Contractor

Cc via transcript:
MARC T. PARRINO, Esquire,
SETH P. TRAUB, Esquire.

SIGNATURE PAGE/ERRATA SHEET
WITNESS: DARRYL ALLMOND  DEPOSITION DATE: 5-19-08
CASE REFERENCE: Allmond vs. Bank of America, et al
ESQUIRE JOB NO. 932513
After you have read your transcript, please note any errors in transcription or amendments to testimony on this page. Please do not mark on the transcript itself.
Please sign and date this sheet as indicated below. If additional lines are required for corrections, attach additional sheets. If there are no corrections, please indicate "None."

PAGE/LINE   ERROR OR AMENDMENT   REASON FOR CHANGE

Under penalty of perjury, I declare that I have read the foregoing document and that the facts stated in it are true, to include any corrections or amendments noted above or hereto attached.

(Witness Signature)          (Date)